PER CURIAM.
In November 1947 appellant and appellee (brothers) made an oral agreement to improve, manufacture and market a power lawn mower which was later sold under the trade name of “Snappin Turtle”. They organized the Whirler-Glide Mower Company for this purpose. The oral agreement was later reduced to writing under which the parties operated their business till December 31, 19S0 when it was dissolved. Appellant agreed to furnish “capital”, tools, plant and manage the financial affairs of the company. Appellee agreed to furnish his patents for a lawn mower he was working on and serve as chief mechanic for the company. Appellant was to have six percent interest on “all cash invested” before profits were deducted, plus fifty percent of net profits. Appellee was to have fifty percent of the net profits, if any, or severity-five cents per hour for labor.
In December 1950 the parties agreed to sell their patents, plus their usable inventory, etc., on a royalty basis to Southern Saw Works of Atlanta, a Georgia corporation, which formed the Southern Whirler-Glide Corporation to manufacture and distribute the • “Snappin Turtle” and other mowers developed and improved by the brothers. As an element of the sale to Southern Saw Works the> brothers agreed to terminate their business connection with each other. A controversy arose between them as to distribution of the assets of the business which ultimately precipitated this suit for an accounting. Before said suit was instituted, considerable negotiations were conducted with a view of effecting a settlement of their differences. An answer to the complaint was filed and much testimony was taken, including that of two patent attorneys and three accountants. Auditors were employed to represent each party, both of whom reached different conclusions as to the basis for computation of the 6% interest provided for in the partnership agreement. At final hearing the chancellor found that a. partnership existed that should be dissolved, that court .costs in 'the sum of $1,178.60 and attorney’s fees for plaintiff’s attorneys in the sum of $5,000 should be imposed on the assets of the partnership, that the net amount due the plaintiff by defendant was $25,540.60 after allowing the counterclaim of defendant in the *689 sum of $6,335.44, and that execution issue in favor of the plaintiff for the net sum found to be due him. Defendant has appealed from the final decree.
Five questions are urged for determination. They challenge (1) the power of the court to enter judgment against appellant for lack of alleged necessary parties to the cause, (2) the court committed error in approving the audit of H. W. Sheppard, (3) it was error to hold appellant guilty of overreaching and imposing on appellee, (4) it was error to hold that the dies purchased by appellant were “tools” as contemplated ■by the written agreement between the parties, (5) it was error to hold that $25,540.60 was due appellee by the defendant.
As to the first question, we find no reversible error. The contention of appellant is that one Franklin was a necessary party to the suit because he received benefits from the profits of the company. Franklin was the son-in-law of appellant. He appears to have worked in the assembly plant in different capacities from its inception. The record clearly shows that he was not a party to the original contract and there is insufficient support for the alleged revised contract between the brothers. The record discloses that Franklin was employed by the company at a fixed compensation and the only evidence of his becoming a partner or participant in the profits of the business is that of the appellant himself, which is controverted by the evidence of appellee. Franklin did not take the stand and there is other evidence to support the finding of the chancellor that the partners in the business consisted solely of Neal and Alexander Smith. The most striking evidence of this fact is the contract of sale and assignment of the patents, inventory, etc., to the Southern Saw Works. Franklin was not a party to that agreement nor was he a party to the agreement dated December 1, 1950, prepared by appellant, which provided: “This agreement entered into so that the present partnership might be terminated * * * .” The latter agreement was executed solely by L. Neal and Alexander Smith. H. W. Sheppard, one of the Certified Public Account-ants, testified among other things that the “company books”, such as they were, reflected no credits or payments to Franklin other than those for weekly wages. Since no profits were.shown to have been paid to Franklin, other than from the testimony of Neal Smith, we feel impelled to follow the conclusions and finding of the chancellor on this point and does not appear to have been controverted in the lower court.
Whether “tools”, as that term was used in the partnership agreement of 1947, encompassed the “dies” that were later purchased under a franchise or license agreement at a total cost of $12,125, is the most difficult question presented. However, “tools” were required to be furnished by the appellant as part of his contribution to the partnership and since these “dies”, although not in the actual possession of the partnership, replaced certain crude tools previously furnished by appellant that had been used to shape the skid pan and deck of the ingenious mower that precipitated this transaction, we find no error of the chancellor for increasing appellee’s share of the profits by one-half of the cost of said dies which was previously deducted as an operating cost. The right to the use of these dies was sold to Southern Saw Works (Southern Whirler-Glide Corp.) with the inventory, patents, etc., of the firm and undoubtedly constituted one element of the basis for the royalties to be paid to. the Smith brothers in the future.
As to the allowance of 6% interest to appellant under the partnership agreement, we find no error in the computation of the accountant and as reflected by the final decree of the chancellor. The partnership agreement as to this point provided: “Before any profits could be determined the company was to pay 6% per annum on all cash invested by party of the first part.” The. accountant testified that he was not given any records or dates as to when specific amounts of money were invested in the’ company by the appellant or withdrawn from operation and that he used a six-month basis to average the amount on which interest was calculated, which he *690 said was reconstructed from the invoices, sales and accounts receivable, ledgers, the complete banking records not being available. In this connection it is not amiss to point out that appellant co-mingled his personal funds with the firm funds, all of which were in the First National Bank of Winter Garden. Included in this personal account of appellant, in addition to the firm's business, were several large real estate transactions, his cattle business, his citrus business and his truck farm account. A complete analysis of his personal bank account does not appear to have been made and only those checks in connection with the firm business were reluctantly shown the auditor.
Account of the co-mingling of the firm’s funds with Neal Smith’s personal accounts and his poor bookkeeping, we find no error in the method employed by Mr. Sheppard to compute interest, in fact his method appears to be the only feasible one to follow under the circumstances. Neither do we find any error' in the disallowance of interest on “tools”, buildings and equipment furnished to the business by appellant. The contention of appellant that interest should be allowed on his entire capital investment appears to be devoid of substance in view of the use of the term “cash invested” in the partnership agreement. The agreement, drawn by Neal Smith, provided that he, the appellant, was to furnish the “capital”, buildings, tools and equipment. The reasonable inference that arises here is that the, “cash invested” did not mean total capital investment, “cash” being merely another element to be furnished by appellant, separate and apart from his other capital contributions and investments.
The other questions as well as those previously discussed turn on the interpretation of highly controverted evidence and the reasonable inferences to be drawn therefrom in the light of the partnership agreement, the conduct of the parties and their interpretations of the agreement. In this case the chancellor heard the testimony, he observed the witnesses, the books were far from models of good accounting practice and the partnership agreement under which these successful and talented brothers operated was far from clear. Taken as a whole there is ample support for the chancellor’s findings and conclusions. The reasonable inferences from the evidence as a whole is one of the most decisive factors in this case. To reverse the chancellor would be to substitute our judgment for his on a matter that he heard from start to finish. We find no theory in law, substance or in fact which would authorize us to do that.
The judgment is therefore affirmed.
MATHEWS, C. J., and TERRELL, THOMAS and HOBSON, JJ., concur.