Argued March 20, modified September 11, 1957

# WIKSTROM *v.* DAVIS ET UX
## 315 P. 2d 597

*Hugh B. Collins,* Medford, argued the cause for appellant. With him on the briefs were John L. Flynn, Portland, and J. Everett Barr, Yreka, California.

*George. W. Kellington,* argued the cause for respondents and cross-appellants. On the brief were Roberts, Kellington & Branchfield, Medford.

Before PERRY, Chief Justice, LUSK, WARNER and KESTER, Justices.

WARNER, J.

This is a suit for the dissolution of a partnership and an accounting. It relates to the operation of a gift and drug business in Medford, Oregon, known as the West Side Pharmacy, in which the parties were partners.

The court found in favor of the defendants Davis upon their counterclaim and against the plaintiff Wikstrom in the sum of $14,383.84, together with interest at the rate of five per cent from the date of the decree, as the amount of the balance due upon the original purchase price of plaintiff's interest in the firm. It is from this judgment that Wikstrom appeals. The respondents have taken a cross-appeal, claiming that this determination of that balance is insufficient and that they are entitled to judgment in the amount of $26,384.18. The figure employed by the court is the fruit of the partnership accounting.

Prior to January 1, 1948, the respondents Davis had operated the business for a short while. On that date they sold a 49% interest in the pharmacy to the appellant Wikstrom, retaining for themselves a 51% interest. The Davises owned the premises where the business was conducted and rented it to the partnership.

The articles of partnership are not in conventional form and leave much to be desired in an instrument of this kind. The instrument as drawn has contributed much to the difficulties encountered by the circuit court and the accountants whose services the parties invoked in aid of their respective positions. The articles in their entirety read:

"FOR AND IN CONSIDERATION of the mutual covenants and stipulations hereinafter contained, the undersigned parties do hereby associate themselves together as partners, for the purpose of establishing and maintaining a wholesale and retail merchandising drug and prescription business at 135 West Main Street, Medford Oregon, with such partnership arrangement to become effective as of January 1, 1948.

"It is understood and agreed between the parties that at the time this instrument is executed the undersigned Cash Davis and Alice Ree Davis are the owners of the merchandise, fixtures, and the building in which the same are located. It is further understood and agreed that the depreciated price of the store fixtures now owned and being involved in this partnership amounts to $3820.50, as of January 1, 1948. The price to be paid by the said Alvin F. Wikstrom for the 49% interest in the stock, good will and fixtures shall be 49% of the value of the fixtures at the figure above mentioned, plus 49% of the value of the stock which is to be determined by an inventory to be taken as of January 1, 1948, by or under the supervision of the parties hereto; that such an inventory will be based upon the cost of the items of merchandise (but such cost price shall in no case exceed the present replacement value) plus an allowance of 3% to cover freight handling and storage charges.

"The undersigned Cash Davis and Alice Ree Davis will retain an interest equal to 51% of the stock and fixtures of such business, and the under-

signed Alvin F. Wikstrom will become purchaser of the remaining 49%.

"Each of the undersigned partners will devote his full working time to such business and shall have drawing accounts as follows:

"Cash Davis— $300.00 per month
Alice Rees Davis— $200.00 per month
Alvin F. Wikstrom— $300.00 per month.

Said Cash Davis and Alice Rees Davis will be entitled to 51% of the profits of such business, and the said Alvin F. Wikstrom will be entitled to 49% of the profits of such business, and will share losses in the same proportion, if losses rather than profits should result.

"For the purpose of this agreement, and not otherwise, the drawing accounts of the parties will be considered in the same category as salary or wages for services so rendered, and profits will be computed and divided thereafter.

"It is not contemplated that the undersigned Alvin F. Wikstrom shall pay in cash any amount for his capital contribution, either at the present time, or on the first day of January 1948. Instead the amount he should pay to the undersigned Cash Davis and Alice Rees Davis will be calculated and established, and may be evidenced by a non-negotiable note, ledger account, or other means satisfactory to all parties. He shall then pay the said Cash Davis and Alice Rees Davis their money plus 5% interest thereon in payments from time to time, and in such amount as the parties will hereafter agree upon. All his share in said business and his right to participate in the profits (over and above the $300.00 per month drawing account) shall stand as security for and shall be applied toward payment of such debt.

"It is further agreed that such partnership shall pay as rental for its use of Lot 16, Block 45, City of Medford, Jackson County, Oregon, a sum equal to 3% of the gross sales from operations conducted on said premises, and in no case less than $150.00

per month; and out of such rental the owners of said building shall maintain the same and will pay all taxes, insurance and municipal liens that may be assessed upon or against said premises. Such rent may not be increased prior to January 1, 1958. And in order to make effective the intention of the parties hereto, the undersigned Cash Davis and Alice Rees Davis each agree to incorporate within his will a provision devising to Alvin F. Wikstrom the right to use and occupy said premises for a period to expire not later than January 1, 1958, at a rental not to exceed that which is herein indicated.

"Because of the peculiar relationship between the parties hereto they have refrained from reducing to writing each and all of the terms and conditions of the partnership agreement, and are writing only those covenants and stipulations which are considered to be the most essential. However, none of the covenants and stipulations which are herein written will be altered except by some further instrument of writing.

"DATED in duplicate at Medford, Oregon, December 1, 1947."

During the continuance of the firm, all the partners took an active part in the business, giving their separate attention in a general way to different major departments of the business.

Mr. Davis and Mr. Wikstrom operated the prescription and veterinary sections, while Mrs. Davis supervised the rest of the store. In addition to keeping the books and handling the funds, she worked on the sales floor and in the stockroom.

As a result of two fires, one in December, 1949, and another in March, 1951, a large amount of merchandise was destroyed or damaged by fire and smoke, but this loss was offset to a substantial degree by insurance coverage.

Friction finally developed between the parties. This prompted the Davises to declare a dissolution of the association as of June 30, 1951, resulting in Wikstrom's expulsion and a continuation of the business by respondents operating alone.

Later in the year 1951, Wikstrom started the suit from whence this appeal comes. The defendants Davis in their answer and cross-complaint asked for judgment against plaintiff for the unpaid portion of the purchase price of his share in the firm and for the foreclosure of their lien against Wikstrom's 49% partnership interest.

As an aid to a better understanding of what we later say concerning the various periods through which the venture passed after the break between the partners up to the final liquidation of assets by the receiver's sale, we set out the principal events in chronological order, employing dates and periods as revealed to us by the findings of the court. The first item of importance in the accounting is the date of dissolution, June 30, 1951. This was *not* followed by steps looking to a winding up of the partnership affairs as might be expected, but rather by a continuation of the business without cessation by the Davises and without participation by Wikstrom from June 30, 1951, to September 7, 1954, the date upon which the receiver qualified and took possession of the assets of West Side Pharmacy from the Davises. The receiver's sale was had on November 10, 1954. Wikstrom filed his complaint in this matter on December 19, 1951, praying for an accounting and the appointment of a receiver. The trial began on June 23, 1952, and continued two days, then was resumed on December 8, 1952, and after hearings for two days was continued again to February 2, 1954, and concluded on February 3, 1954.

After the commencement of the trial and sometime prior to December 31, 1952, the parties stipulated in open court:

"* * * that an account of the affairs of the partnership business as of December 31, 1952, should be made and that the plaintiff should not be entitled to any share in the profits, if any, made from and after said date and the purchase price of plaintiff's 49% interest in said business should not draw any interest from and after said date and that from and after said date the capitalization of the business would remain the same until such time as the matter was finally disposed of by the court and, hence, no harm would be done to the parties, plaintiff and defendants."

The plaintiff-appellant rests his appeal upon four assignments of error. He first advances the proposition that the court erred in finding that the business operated on a gross margin of 30%, i.e., 30% of the total retail sales price from January 1, 1948, to June 1, 1951. It is his contention that the court should have employed 33% as the proper measure of that item when necessary in the accounting to account for the cost of merchandise where its cost could not be determined in the absence of adequate records of the firm.

The second assignment represents that the court should not have adjudicated the appellant's rights in the partnership as of the date of and by the results of the receiver's sale had on November 10, 1954. This assignment embodies the contention that under the provisions of ORS 68.640 appellant is entitled to have the value of his interest in the firm determined as of June 30, 1951, the date of the dissolution.

The third assignment springs from appellant's assertion that the court erred in not giving a value to the good will of the firm as of the time of the dissolution.

The fourth and last assignment urged upon us by plaintiff is predicated upon the court's failure to have given a value to what he claims to be a lease created by the partnership agreement.

We find the defendant-respondents have also limited themselves to four assignments of error in their cross-appeal.

Their first assignment corresponds in subject matter to the first assignment of the plaintiff-appellant. They, however, argue that the margin of gross profit should have been computed on the basis of 27% instead of 30% as found by the trial court and contra to appellant's position that it should be 33%.

Their second item of error relates to the court's finding that the purchase price of Wikstrom's interest in the business was $22,348.74 instead of 49% of $53,335.67 (an amount subsequently agreed by the parties to be the value of the merchandise inventory as of January 1, 1948).

Respondents' third assignment represents that the court erred in not finding that the partnership was dissolved as of June 30, 1951.

By their last assignment it is argued that respondent Cash Davis should be allowed compensation for winding up the business during the period from June 30, 1951, to December 31, 1952.

In order to give proper answer to the several assignments of error by the court, as made by the parties, we are dependent upon the record brought to us. We have already observed that more than six days were consumed in the taking of testimony. The trial resulted in the voluminous record brought to us for examination. Perhaps it would be more accurate to say that the record is "dumped into our lap" in a multitude of

small pieces like mosaic, out of which we are expected to fashion a complete and accurate accounting picture of the partnership business, and do it without the aid of accountants such as the lower court had for consultation before coming to its final judgment. The record here comprises a transcript of testimony of 512 pages and 40 exhibits. In the main, these exhibits are miscellaneous records of account, many being composed of a large number of separate financial items of a kind. One of such exhibits contained approximately 3,700 checks.

Taken as a whole, it is an amazingly inadequate financial record for a business of the kind and character in which the parties were engaged. This is especially true when one contemplates the magnitude of the firm's gross sales of so many relatively small items over the period of time that the parties were associated together. For the three and one-half years from January 1, 1948, to June 30, 1951, the date of dissolution, the gross income was approximately $424,000 and disbursements of about $420,000. During the financial period of a year and one-half following the initial dissolution, to December 31, 1952, while the Davises continued to operate instead of liquidating the former partnership, the gross sales were around $196,000 and expenses for the same period were $174,000. During the entire period of our particular concern, that is, the five years in which the West Side Pharmacy operated up to December 31, 1952, there was an over-all gross income of approximately $620,000 and disbursements for merchandise and expenses totaling about $594,000, yet with no accounting system worthy of the name for a business of such magnitude before the dissolution and with only one person, Mrs. Davis, as bookkeeper, attempting to keep a token record, but,

obviously, without sufficient training for that kind of service.

During all the periods covered by the accounting detail presented, the firm was engaged in the filling of prescriptions, the sale of packaged drugs and toiletries, for a time items from a small gift stock and gift wrappings, previously acquired by the Davises, veterinary supplies, tobaccos, films and candies, magazines and papers and other miscellaneous items common to a store of that character. Not a few of these items were subject to federal retailers excise taxes.

We learn that often the cash register operated without tape to record the sales of the day. We also find that many purchases by the firm were paid in cash without a receipt or invoice or other token to indicate the purpose or justification for the cash outlay so made.

Respondents were not able to discover and produce bank checks for the years 1949, 1950 and 1951 until the second day of the trial. At that time the trial court was informed by respondents that the bank checks had been found only the night before by Mrs. Davis after going "through a lot of barrels and so forth." This discovery of the missing records was about six months after the filing of plaintiff's complaint.

There appears to be no sound reason or justification for the carelessness or indifference, apparent to some degree, on the part of all the partners which produced these confused and inexcusable financial records now before us. The importance, if not the necessity, of maintaining financial records usual to a business of this kind becomes apparent if the partners were to have the usual and periodic, satisfactory settlements between themselves, and also to insure that their income tax returns and the firm's returns for federal retailers

excise taxes collected should pass without challenge. The situation of the partnership with reference to these tax matters is brought to our attention by statements of respondents' counsel made at the time of the hearing in this court when he advised in response to a question that his clients, the Davises, had been "turned in" to federal tax authorities and that "it had cost them a pretty penny."

We find ourselves in complete accord with the statement made by the experienced and able trial judge, who, in his summation at the conclusion of the trial, said:

"I might say, in regard to the incomplete records, that both parties are to blame for that. In the first place, you didn't have an adequate contract. In the second place, Mr. Wikstrom didn't use any effort at all to protect himself. Mr. Davis is equally responsible for not taking an inventory. You have carried on for a good length of time, then you expect the court to rescue you by knowing exactly what happened. You haven't kept adequate records, and either one of these partners could have insisted upon adequate records at the time."

We do not wonder that there was a lapse of nearly eight months after the trial to enable the judge to translate the mass of data the court had to consider in order to come to the persuasive conclusions which were finally made.

In the state of the firm's records, this court is fortunate we are not confronted with the necessity of passing upon any claim made by any of the partners against the other imputing fraud or embezzlement involving the partnership property or funds.

■ *Shores v. Hollister*, 111 Or 330, 223 P 741, 224 P 830, was an appeal in a suit for a dissolution of a part-

nership and for an accounting. Because of the status of the record here, we are moved to repeat what we said in the Shores case (110 Or 331):

"We have given the testimony herein a careful and thorough examination. We find it difficult, in view of its contradictory character, to determine exactly where the real truth lies; the contradictions arising perhaps from a rather loose course of dealing and consequent misunderstanding between the parties, rather than from any conscious disposition to misrepresent the facts. The learned circuit judge who heard the case had the witnesses before him and no doubt knew them all personally, as they are men of standing in the community, and was much better qualified to appraise the value of their testimony than we are; and we are inclined to accept his conclusions as correct, or as near an approximation to correctness as can be attained from the confused and contradictory testimony adduced on the trial. * * *"

In matters of this kind we always give great weight to the findings of the trial judge. *Malick v. Malick*, 208 Or 107, 108, 298 P2d 841.

The record and findings of the court bespeak the meticulous care and attention which the trial judge gave to this matter. Moreover, after the trial and with the knowledge and acquiescence of the parties and at his request, the trial judge had the benefit of consultations with Mr. Brewer, a public accountant, who was called by the respondents and Mr. Flynn, the public accountant who testified for the appellant. Both of these men were experienced in the field of their special profession. These are factors which give additional weight to the trial court's findings of fact and prompt us to say that we adopt and approve the findings of the lower court in every respect, except in the very few particulars hereinafter noticed.

For the reasons which follow, we find ourselves in harmony with only two of the assignments of error advanced: the second assignment of respondents as cross-appellants, which does not raise an issue of fact, but rests upon construction of the partnership agreement, and the second assignment tendered by appellant, which is primarily a matter of law.

■ We turn our attention first to respondents' second assignment. This challenges the court's method of determining the amount Wikstrom obligated himself to pay for his 49% interest in the firm as of January 1, 1948, the effective date of the articles of partnership.

We look to this agreement and find that the parties stipulated that the purchase price to Wikstrom was to be computed in the following manner:

> "* * * The price to be paid by the said Alvin F. Wikstrom for the 49% interest in the stock, good will and fixtures shall be 49% of the value of the fixtures at the figure above mentioned [$3820.50], plus 49% of the value of the stock which is to be determined by an inventory to be taken as of January 1, 1948, * * *."

This language of the agreement is plain and unambiguous. It contains no provision for deducting the amount of such accounts payable as the Davises may have had on January 1, 1948. We find no evidence warranting a conclusion that a figure for accounts payable was an element to be considered in calculating the purchase price chargeable to Wikstrom. Moreover, the plaintiff makes no claim to such a credit, nor does he argue against respondents' contention for its elimination.

The parties are agreed on $53,335.67 as the value of the merchandise as of that time.

The court, notwithstanding that in its Finding X it also adopted the $53,335.67 as the beginning inventory figure, gave "it an adjusted value of $41,789.17 by reason of the deduction of the then accounts payable of the predecessor business," but without assigning any evidentiary or legal ground therefor. The amount so deducted was $11,546.50. To this "adjusted figure" the court very properly added the value of the fixtures in the amount of $3,820.50, thereby producing a total of $45,609.67. Forty-nine per cent of this last amount is $22,348.74, the purchase price to Wikstrom, as found by the court.

To accomplish this result was, in effect, making a new contract between the parties as to the manner for determining Mr. Wikstrom's obligation to the Davises.

Neither courts of law nor of equity have the right or power to make contracts for the parties, or to alter or amend those that the parties have made. It is the intention of the parties, manifested by their words, and not the whim of the court, that must be the guide in construing contracts by the parties thereto. *Scheuerman v. Mathison,* 74 Or 40, 144 P 1177; *Blessing v. Ocean Acc. & Guar. Corp.,* 152 Or 632, 635, 54 P2d 300; *Slayter v. Pasley,* 199 Or 616, 626, 264 P2d 444. We think that the intention of the parties under the agreement is too clear to warrant a deduction of a figure for accounts payable in finding the amount of Mr. Wikstrom's indebtedness to the Davises. Eliminating this deduction, the measure of appellant's initial obligation to the Davises would be $28,006.52 instead of $22,348.74.

The figure of $14,383.84 adopted by the court in the judgment as the balance of the indebtedness due on December 31, 1952, from Wikstrom to the Davises, is

the original amount of the purchase price, as determined by the court to be $22,348.74, when reduced by Wikstrom's share in the profits earned during the period from January 1, 1948, to December 31, 1952, after first applying the profits to interest accrued on each profit paying date. We would readily accept as correct the amount $14,383.84 directed by the court from the carefully followed formula which it employed were it not for the reduction in the purchase price made by first deducting $11,546.50 as the amount of accounts payable. Taking the figure which we deem to be a correct determination of Wikstrom's obligation when he purchased his interest in the firm on January 1, 1948, i.e., $28,006.52, and crediting this amount with the same total amount of earned profits used by the trial court, and on the same dates by first crediting accrued interest and then to principal, in short, following the same mathematical formula used by the lower court, we find the balance due from Wikstrom to the respondents as of December 31, 1952, was $22,293.46. But, as we will find after our review of appellant's second assignment of error, this amount is entitled to a further substantial reduction which we will ultimately make.

■Employing the language of Wikstrom's second assignment of error, he represents that appellant's rights to profits or interest should not have been determined as of the date of and by the results of a receiver's sale, but should have been determined "as of the date stipulated by the parties that the appellant's interest in the firm was to cease." The last date referred to is December 31, 1952, and has its foundation in the stipulation to which we have earlier called attention.

The statement is not precisely true. The court did make a determination of the amount of the profits

which had accrued to Wikstrom as of that date and properly credited them upon the debt of Wikstrom to the Davises with a resulting balance in the amount of $14,383.84, as of December 31, 1952. This balance, we have held, was in error and that the correct amount of the Wikstrom debt was $22,293.46 as of that time after crediting the same amount of profits used by the court. The court did, however, by its decree of August 24, 1954, make the following direction respecting the disposition of the proceeds accruing from the receiver's sale:

"IT IS FURTHER, ORDERED, ADJUDGED AND DECREED that the said receiver shall apply the proceeds, if any, of such said sale in the following manner: First, to the costs and expenses of said receiver and said sale; Second, 51% of the balance of said proceeds then remaining shall be paid over unto the defendants in full payment of their 51% interest in and to the said 'West Side Pharmacy'; third, of the remaining 49% of said proceeds, the sum of $14,383.84[*], together with interest thereon at the rate of five per cent per annum from the date of the entry of this decree herein, shall be paid over unto the defendants in satisfaction of defendants' lien upon plaintiff's said 49% interest in and to said business and said assets; fourth, the then remaining balance, if any, of said 49% of said proceeds shall be paid over unto the plaintiff in full satisfaction of any and all claims which he may have, or claim to have against the said 'West Side Pharmacy', and the said defendants, or either of them, arising out of said copartnership relationship, or otherwise;  *  *  *."

*[In the original decree the figure in the foregoing paragraph appears as $14,223.98. This is obviously an error, whereas, the figure employed above is in harmony with the court's findings and appears in the first and second paragraphs of the judgment as $14,383.84 and there shows

that it was obviously corrected on the face of the decree to so read, but through apparent oversight was not corrected as we have used it above and as it also is corrected to read in the copies of the abstract of record supplied by cross-appellants.]

We are of the opinion that the court's decree in this respect was erroneous, primarily because Wikstrom, having been expelled from the firm as of June 30, 1951, became a creditor of the Davises as of that date to the extent of the then current value of his then 49% interest in the partnership and for the further reason that from and after that date the Davises retained possession of the firm assets, made no accounting to Wikstrom and elected to continue the business thereafter as their own without taking any steps toward winding up the old partnership as they were bounden to do. Wikstrom no longer was required to participate in a division of the assets as a partner on the conclusion of the receiver's sale, but rather as an ordinary creditor, to be paid before the balance was divided between the Davises.

In this matter we must not overlook that as of the date of the receiver's sale Wikstrom was still indebted to the Davises for the unpaid balance of his purchase price in the amount of $22,293.46 and the Davises were entitled to have the value of his interest as of June 30, 1951, offset against that debt, if less than his purchase price indebtedness to them, and to have judgment against Wikstrom for any balance which might then remain.

As far as we can ascertain, the court never made a determination of the value of the Wikstrom interest as of the date of the dissolution, June 30, 1951, although, as we shall later see, there was sufficient evi-

dence in the record from whence such a value could be ascertained.

■ The foregoing conclusions with respect to the value of appellant's interest on the date of dissolution are derived from the provisions of ORS 68.640 (Section 42 of the Uniform Partnership Act). This section reads:

> "When any partner retires or dies, and the business is continued under any of the conditions set forth in subsections (1), (2), (3), (5) or (6) of ORS 68.630, or paragraph b of subsection 2 of ORS 68.600, without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; provided that the creditors of the dissolved partnership as against the separate creditors, or the representative of the retired or deceased partner, shall have priority on any claim arising under this section, as provided by subsection (8) of ORS 68.630."

The foregoing section is a substantial embodiment of the common-law rule that when a partner dies and the business is continued by the remaining partners without a settlement of accounts between the remaining partners and the representative of the deceased, the representative may have the value of the deceased's interest at the date of dissolution ascertained and the representative shall receive an amount equal to the value at dissolution, plus interest, or, at the repre-

sentative's option, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership. The same common-law rule applies when a partner voluntarily or involuntarily leaves the partnership without assigning his interest to the other partners or agreeing to a continuation of the business. Pollock, Digest of Law of Partnership (ed 1878) p 108; Storey on Partnership (5th ed) § 343; *Cahill v. Haff*, 248 NY 377, 380, 162 NE 288.

We observe that ORS 68.640 makes no distinction between the rights of a deceased partner or one expelled or voluntarily retiring from the partnership as the privilege conferred on the estate of a deceased partner and one voluntarily or involuntarily retiring from the previous business association when the business is thereafter continued by the other partners under the conditions set forth in certain subsections of ORS 68.630 stipulated in ORS 68.640. The conditions thus referred to are where the business is conducted without liquidation of the partnership affairs.

ORS 68.630, taken as a whole, determines the liability of the person continuing the business of the prior or old partnership. It is designed to give protection to the creditors of the dissolved partnership.

Subsection (6) of ORS 68.630, supra, identifies the circumstances or conditions which prevailed on the dissolution of the West Side Pharmacy. This subsection reads:

> "When a partner is expelled and the remaining partners continue the business either alone or with others, without liquidation of the partnership affairs, creditors of the dissolved partnership are also creditors of the person or partnership continuing the business."

This is the particular subsection which makes ORS 68.640 operative in the instant matter.

Not only are the parties agreed that the dissolution occurred on June 30, 1951, but the trial court likewise adopts this date in its Finding XIX, wherein it says: "That the defendants on or about June 30, 1951, did take control of the business and have been and now are in the possession and sole control of the assets of said business and since said time have been, and now are, operating and conducting said business." The court further found that the Davises continued in operation without making any accounting to plaintiff. The warrant for claiming an explusion of Wikstrom is found in Mr. Davis' statement that a couple of days before the dissolution the parties "had words, and I [Cash Davis] said the partnership was going to cease because there was too much friction, we couldn't get along * * *."

The word "expelled" as used in ORS 68.630 (6) is a rather harsh term, suggesting the use of force, which, of course, was not present here. We read it in this matter with the permissible meaning which denotes any exclusion. We think the conduct of the Davises warrants a finding that Wikstrom was excluded both at the time of the dissolution and thereafter during the long subsequent conduct by Davises in continuing the business without him. We hasten to add, however, that expulsion is not the only event which will justify the application of ORS 68.640. Subsections (1), (2) and (3) of ORS 68.630 indicate that the voluntary withdrawal of one partner can give rise under ORS 68.640 to the privileges accorded the retiring partner with the incident liabilities of the continuing partners.

What we particularly note here is: that under ORS 68.640 Mr. Wikstrom's status as of the dissolution date

was translated from active partnership membership to that of "an ordinary creditor [in] an amount equal to the value of his interest in the dissolved partnership." (ORS 68.640, supra) If the business is continued by his former associates, as was done in the matter at bar, he is entitled to have the value of his interest as of the date of dissolution, and to receive interest thereon or "at his option * * *, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership," subject, of course, to the rights of other creditors holding claims against the partnership as provided by ORS 68.630 (10).

We view this as an implementation of the declaration contained in ORS 68.340 (from Section 21 (1) of the Uniform Partnership Act) that: "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, *or liquidation of the partnership or from the use by him of its property.*" (Emphasis ours.) *Moseley v. Moseley,* 196 F2d 663, 666 (9th Cir, 1952).

Thus, we find the foundation for our earlier statement that Wikstrom enjoyed the status of a creditor and not of a partner in the distribution of the proceeds accruing from the receiver's sale.

Wikstrom elected to receive "the profits attributable to the use of his right in the property of the dissolved partnership." The court recognized this factor in its computations of profit for the period from June 30, 1951, to December 31, 1952, and correctly credited them upon the Wikstrom debt to the Davises. This right to profits on his interest was, however, terminated by the stipulation as of December 31, 1952.

ORS 68.640 has not been heretofore construed by

this court, but we find that the construction which we have given is in accord with the holdings in those jurisdictions where this section of the Uniform Partnership Act has been reviewed.

In *Moseley v. Moseley,* supra, plaintiff and two others formed a partnership to manufacture soap. In time, the other two notified plaintiff that the partnership was dissolved, but offered to buy him out. The plaintiff refused their offer, instead went to court and asked that his interest in the business be valued as of the date of dissolution, and he be paid such amount, plus profits after dissolution attributable to his interest kept in the business. The court allowed plaintiff's claim, holding that the applicable California law (section 42 of the Uniform Partnership Act) entitled him to be paid the value of his interest as of the date of dissolution, plus interest, or, in lieu of interest, plaintiff could take profits. Referring to the right of election given to an outgoing partner, the court said (pp 666-7) : "The right of election which appellant has thereunder is one which he should be permitted to exercise after an accounting shall have been taken of the earnings subsequent to dissolution. Otherwise, the right of election would be an illusory one."

In the case of *Nuland v. Pruyn,* 99 Cal App2d 603, 222 P2d 261 (1950), the rights of a former partner whose former associates took over and used the partnership business and property after dissolution and without accounting were stated to be as follows:

"* * * If the partnership was by the notice rightfully dissolved on September 6, 1944, appellants' rights would have been as follows: They would have been entitled to have their ownership in the assets determined as of that date and paid over to them in money or in kind; if this was not done and their property was used in the business

they would have had, on account being taken, an election to receive their property and to share in the profits made thereafter in the proportion their property bore to the whole or to be paid interest on the value of their property so used. * * *"

Other cases in point are *Bracht v. Connell,* 313 Pa 397, 402, 170 A 297 (1933); *Vanderplow v. Fredricks,* 321 Mich 483, 32 NW2d 718 (1948); *M. & C. Creditors Corporation v. Pratt,* 172 Miscl 695, 17 NYS2d 240, aff'd 281 NY 804, 24 NE2d 482 (1939); *Cahill v. Haff,* supra; *Annos to Forbes v. Becker,* 80 ALR 12. Also see discussions on Sections 41 and 42 of Uniform Partnership Act (ORS 68.630 and 68.640) 38 Minnesota Law Review, 553-565 (1954) and 63 Yale Law Review, 709-716 (1954).

The rationale of the common-law rule which is now reflected in ORS 68.640 is readily evident and consonant with sound financial and business concepts. Wikstrom was initially a purchaser of a substantial interest or equity in the partnership assets. He was still the owner of such fractional interest, at whatever value it was at the time of dissolution, even though he had not yet completed full payment of the purchase price. Under the circumstances, he could have received from those continuing the business the then value of his share by repurchase from him. In the absence of such an offer from the Davises he was entitled to receive it later upon the completion of the winding up of the business of the old partnership. The relation of the Davises to Wikstrom after June 30, 1951, with reference to the value of his equity at that time is somewhat analogous to that which they would have sustained if they had borrowed from Wikstrom on the date of dissolution a like amount of money payable on a day corresponding to the final termination of

the old partnership. Viewing it thus gives additional force to the retiring partner's status as an "ordinary creditor" as declared by ORS 68.640. Wikstrom, as the retiring partner, had, however, a greater interest than to just recoup the value of his equity. He continued, until liquidation was complete, contingently liable for the payment of all partnership debts incurred by the old partnership prior to the dissolution date. This liability could only be terminated by a liquidation which would insure payment to such partnership creditors. The option conferred by ORS 68.640 to receive interest or profit on his share while awaiting receipt of this value upon the completion of the winding up of the partnership business is in the nature of a species of compulsion as to those continuing the business in order to hasten its orderly winding up, thereby avoiding the burden to themselves of paying Wikstrom interest or profits for the use of his property.

Although the trial court, as we have heretofore said, correctly computed Wikstrom's share in the profits earned subsequent to the dissolution and applied them as a credit to Wikstrom's debt due the Davises, it failed to surcharge the Davises with the value of Wikstrom's equity as of the date of dissolution. Instead, it suffered that amount to be determined from the proceeds of the receiver's sale (a time more than three years after June 30, 1951), from what remained after the costs of sale and payment of partnership creditors, other than Wikstrom. In short, it ignored Wikstrom's status as an "ordinary creditor" from and after June 30, 1951, for the value of his share as of that date and would have compelled him to take instead a far lesser amount.

■ What then was the value of Wikstrom's interest on June 30, 1951? This can be ascertained with reason-

able accuracy from the record. The accountants Flynn and Brewer both made separate reports covering their separate and respective examinations of the firm's financial affairs for the period from January 1, 1948, to June 30, 1951. Mr. Flynn's report is denominated as "Report Upon Limited Examination" and is marked "Defendants Ex. J." Mr. Brewer's report was received as "Defendants Ex. F." Both reports carry a balance sheet for the period indicated. The Flynn report shows the "net assets" or net worth of the partnership to have been $42,389.83 as of June 30, 1951. The Brewer report gives it as $40,111.81 as of the same date. The difference in this respect is $2,278.02. Both reports disclose the difficulties which the accountants had in obtaining accurate information because of the paucity of book records, consisting solely (as stated by Mr. Flynn) of "a cash book, a purchase record, and certain employees' earnings records." The partnership maintained no general ledger for the purpose of providing a permanent record of partnership assets, liabilities or of individual partner's equities. Under the circumstances, we think the difference in the net worth of the firm as of June 30, 1951, as reflected by the two reports is remarkably close.

Both reports are identical as to certain substantial items, thus both adopt $60,160.23 as the value of the merchandise inventory and both set up mortgages payable as $11,367.00 with accrued interest as $141.59. Indeed, their total figures for all assets including the foregoing amount for merchandise, vary only 86 cents. The substantial differences are represented by Brewer's sum for accounts payable, which exceeds Flynn's by $1,339.74, and Brewer's figure for accrued taxes, state and federal, of $970.99, whereas Flynn makes no allocation for this item. Without disparagement of

Mr. Flynn's excellent work, we are disposed to start with the net worth disclosed by the Brewer report and primarily because the record discloses Mr. Brewer was for a longer time closer to the actual firm operations. Among other things, he kept the firm books beginning sometime after July, 1951.

However, we discover that the court in its Finding XVI, in computing the cost of the merchandise at hand on June 30, 1951, and the net profits earned, adopts the merchandise value of $60,160.23, exactly as found in the reports of both accountants and then deducts therefrom $5,522.67 as the value of obsolete merchandise. We think the court was correct in so doing. This necessarily compels us to deduct from the net worth of $40,111.81 found by Mr. Brewer the same amount of $5,522.67, charged off by the court for obsolescence. Thus, we find the net worth of the old firm to have been $34,589.14 and that the value of Mr. Wikstrom's 49% equity therein was $16,948.68. This is the sum which should be credited to the amount of Mr. Wikstrom's debt to the Davises as it was on December 31, 1952, and which we have heretofore found to be $22,293.46. When the Wikstrom debt is offset by the value of his equity on June 30, 1951, as we determine it, it leaves a balance of $5,344.78 due from him to the Davises instead of $14,383.84, as found by the trial judge.

We note that notwithstanding the foregoing results, we have left undisturbed the basic figures relied upon by the court as a result of its findings. The essential differences between our figures and those employed by the trial court arise from what we conceive the proper accounting placement of the figures so found and made necessary by rules of law which we have applied in discussing respondents' second assignment

of error on their cross-appeal and appellant's second assignment of error.

We find no merit in the remaining six errors presented by the respective parties. Reasons for so holding with reference to appellant's first and fourth assignments and the respondents' first and third will be found in what we have heretofore said.

■ As we have earlier indicated, appellant complains under his third assignment that the court failed to assign a specific value for goodwill, but he fails to point to any testimony upon which such a value could be reasonably predicated, if, in fact, the partnership during its relatively short existence of three and one-half years had acquired a goodwill meriting a separate value. We also note that neither accountant Flynn nor accountant Brewer enter a value for goodwill in their respective balance sheets which we have referred to above.

■ In their fourth and last assignment of error, the Davises, as cross-appellants, represent, as we have said, that the court should have allowed Cash Davis a reasonable compensation for his time spent in winding up the affairs of the firm. The contention rests upon the false premise that he was ever so engaged. Between the date of the dissolution, i.e., June 30, 1951, and the date the receiver qualified and took possession of the firm property, September 7, 1954, there was a lapse of approximately three years and two months. During this time the Davises were in exclusive control of the partnership assets and as far as we can learn from the record were carrying on the business "as usual" without any apparent interest or effort to wind up the business of the old firm as was their duty to begin doing immediately after the dissolution. "Winding up" means the administration of the assets for the

purpose of terminating the business and discharging the obligations of the partnership to its members. *Duncan v. Bartle,* 188 Or 451, 470, 216 P2d 1005.

The attitude of the Davises after the dissolution was one of utter disregard, if not active defiance, of their duty to wind up the old business of the old firm. This is indicated by the answers given by defendant Cash Davis on cross-examination, during that part of the hearing held on June 24, 1952:

"Q Since the termination of the partnership, have you and Mrs. Davis continued to operate the business?

A Yes.

Q Have you used all the assets, with the exception of turn-over in inventories, that were used by the former partnership composed of the three of you?

A We ran the business just like it had been.

Q And have you made any attempt to wind it up?

A To wind up the partnership?

Q No; to wind up the business—to liquidate it, in other words.

A Not any more than I have done. We kept on running until this thing was settled."

Counsel for the Davises shortly after informed the court that his clients would follow whatever decree the court might render, but in "the meantime, we are going to continue operating as we now are" and if "Mr. Wikstrom would pay us the money he is obligated to pay, then we will liquidate the business." This was apparently the pattern adhered to until the receiver took possession when the liquidation first began and thereafter continued in earnest.

ORS 68.310 (6) provides:

"No partner is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his *services in winding up the partnership affairs.*" (Emphasis ours.)

In *Duncan v. Bartle,* supra (188 Or 483), the foregoing rule was applied, but only for those services necessitated in winding up the business from and after a date certain, established as the day Mrs. Duncan started to liquidate the firm, even though she had been in exclusive possession of the assets and continued to conduct the business alone for more than seven months prior to the date of the beginning of the actual liquidation. Here, we have no knowledge when the Davises claim to have started winding up the firm's affairs, if they ever did. The Duncan case is replete with evidence of Mrs. Duncan's good faith and desire to settle the partnership accounts without delay. Such is not apparent on the part of the respondents here.

The decree will be modified in accordance with this opinion.

Costs to neither party.