BOLLINGER *v.* BOLLINGER, ET AL.

[No. 278, September Term, 1965.]

*Decided April 26, 1966.*

The cause was argued before PRESCOTT, C. J., and HAM-
MOND, MARBURY and McWILLIAMS, JJ., and CARTER, J., Chief
Judge of the Second Judicial Circuit, specially assigned.

*Donald C. Sponseller,* with whom were *Stanford Hoff* and
*Sponseller & Hoff* on the brief, for appellant.

No brief and no appearance for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

The late Ring Lardner, were he writing this opinion, might
have begun it by saying that although the Bollinger boys were
not very congenial brothers they were not very congenial part-
ners either. George (appellant) is the youngest. Stanley is the
oldest and Francis fits somewhere in between. They are the ap-
pellees. The three brothers have spent their lives in the vicinity
of Westminster, where, until 1958, they farmed, operated or-
chards and did grading and excavating work under informal and
apparently unsatisfactory cooperative arrangements.

On 1 October 1958 they executed a formal partnership agree-
ment which had been prepared for them by counsel employed
for the purpose. This agreement required each to contribute

$20,000 in capital, gave each a one-third interest in the partnership and provided for the distribution of profits in equal shares. Among other things, each partner was given the right to withdraw from the partnership upon giving thirty days' notice to the others.

By common consent George devoted most of his time to the farms and the cattle but from time to time he helped with the excavating. Stanley handled all of the grading and excavating. Francis did some farm work but for the most part he helped Stanley.

It was not long before the partnership began to fall apart. On 9 April 1960 George served on Stanley and Francis notice of his withdrawal. He told them he would "be forced to take definite action" unless they settled with him before the expiration of 30 days. The wording of the notice reflects the depths of his bitterness and disillusionment. "Since everything I say is a lie before I say it and regardless of how right I am I'm always wrong * * * [it] makes life here seem like a living hell" and, he continued, "I do not intend to live under [it] for the rest of my life."

In addition to "many slanderous things" he accused them, in the notice, of "dishonesty in dealing with each other." He documented this charge with a recital of two revealing incidents. Francis told him, he went on, "that Stanley and Edna [Stanley's wife] were a hindrance to the Company and should be eased out * * * that Edna's gossip was bad for the Company and that Stanley * * * [did] very little work." He said Francis suggested taking over as manager and that he (Francis) could "make a lot more money elluminating Stanley's bludering and stupidity." He said he told Francis that if he was so smart he ought to be able to "improve and profit the company without degrading or elluminating Stanley."

Stanley's proposal, on the other hand, was somewhat more direct and unsubtle. It seems that Francis "bought the Blizzard property and worked at it solely to profit himself." George said, "Stanley and Edna came to me and told me that while Francis had violated the partnership and was profiting himself by it, that I and Stanley should take unknowingly to Francis large sums of money and split between us." George claims he

told Stanley that "two wrongs [did not] make a right, and * * * [that he] refused to have any part of this."

George concluded his notice by saying he thought the "fair and reasonable value" of his interest in the partnership was $35,000, which, in addition to his life insurance policy and his pickup truck, he was ready to accept.

Stanley's reaction was short and to the point. He told George he was crazy. A few days later Stanley and Francis came to George's house and took possession of all of the books and records, which had been kept for the partnership by George's wife, Ruth. According to George, Francis said "if you walk out now all the farms will go to ruin" and asked him if he would "stay the summer." George agreed to stay until October and he testified he continued working as before. Stanley was sharply contradictory. He testified that after 9 April 1960 George "contributed very little, if any" to the business. Francis conceded "he [George] did some towards it."

In October George discontinued his efforts in behalf of the partnership and became a salesman in his brother Edward's real estate business. There is testimony that he tried, on many occasions, to effect a settlement with Stanley and Francis. They usually agreed that something ought to be done but they never seemed to get around to it. There was some talk of paying him $18,000 but it is not clear that a firm offer ever was made. In the summer of 1962 George began to realize that they would never settle with him unless he applied pressure. He employed counsel who, late in September, wrote to the others suggesting the likelihood of litigation unless an amicable settlement could be effected.

Counsel's letter having been ignored by Stanley and Francis, George's bill in equity was filed on 4 March 1963. In the prayer for relief he asked that his brothers be enjoined from removing or destroying any of the partnership records, that an auditor be appointed to examine the records and accounts and report thereon and that a judgment be entered against them for the amount due him "together with legal interest from the day payment should have been made" to him. At the suggestion and upon the agreement of counsel, Chief Judge Boylan, on 31 May 1963, appointed Frederick Paul Keppel, a certified public

accountant, "to examine into the accounts and records of" Bollinger Brothers. Keppel submitted his report to Judge Boylan on 19 July 1963. It was his opinion that on 9 May 1960, conceded to be the date of dissolution, the net worth of the partnership was $65,979.92.

Early in September 1963, counsel for Stanley and Francis offered George $21,993.31 (⅓ of Keppel's valuation) in exchange for a general release, the dismissal of the equity proceeding and the payment of ⅓ of the court costs and ⅓ of Keppel's charges. George declined the offer and pressed for a hearing on the validity and accuracy of Keppel's report. On 22 January 1964 Judge Boylan heard the testimony of the partners and a number of other witnesses. He died just short of a year later leaving the matter undecided. On 7 June 1965 counsel stipulated that the case be submitted to Judge Edward C. Weant "for a decision upon the testimony heretofore taken before the late Judge James E. Boylan, Jr."

Judge Weant promptly filed an able and comprehensive opinion in which he held that 9 May 1960 was the date of the dissolution of the partnership and that the "partners are entitled to an accounting." He discussed all of the conflicting claims in respect of valuation and found the interest of each partner to be worth $22,326.64. From his order directing the entry of a judgment in favor of George against Stanley and Francis, George has taken this appeal. No brief was filed on behalf of Stanley or Francis.

The first of George's contentions is that Judge Weant incorrectly valued his interest in the partnership. There are many pages of conflicting testimony having to do with the dairy herd, the farm machinery, the crops and the sale of cattle. The same is true in respect of the grading and excavating equipment. Judge Weant observed that the records were not as clear as they might have been and that George made no effort to provide appraisals on his own behalf. The judge adopted Keppel's figures for the construction equipment, the heifers, the crops and the farm machinery. He increased Keppel's valuation of the dairy herd. There was little or no dispute about the other items. For some reason, to us unknown, the interest on a $10,000 savings account was omitted. Otherwise we see no reason to disturb

Judge Weant's findings as to valuation. See cases collected in 2 M.L.E., *Appeals*, § 443 (1960) ; *Smith v. Smith*, 78 So. 2d 687 (Fla. 1955) ; *Combs v. Haddock*, 11 Cal. Rptr. 865 (1961) ; *Gotta v. Colombero*, 138 Cal. App. 2d 676, 292 P. 2d 261 (1956).

George's second contention is that he is entitled to interest, from the date of dissolution, on the value of his share in the dissolved partnership. Judge Weant held that he was not entitled to interest because his demand for $35,000 "was the cause for his not being paid more promptly." He indicated that his "exorbitant demand * * * discouraged settlement." We do not agree.

It must be conceded that George was not conspicuously diligent in pressing his claim. On the other hand it cannot be said that he slept on his rights. He kept after his brothers about settling with him but they appear to have been quite adept at putting him off. That he did not file suit against them sooner may very well reflect a diffidence arising out of the fact that he was the youngest and a hope that eventually they would deal justly with their brother.

Assuming, for the sake of argument, that his demand was "exorbitant" it is not at all clear from the evidence that he steadfastly refused to consider anything less than $35,000. On the contrary, there is evidence tending to show that, in desperation and disgust, he was ready at one time to accept $20,-000 and would have done so if Stanley and Francis had not insisted on deducting $2,000 for electricity and gasoline which they claimed was paid for by the partnership. There is nothing, prior to September 1963, to indicate that a firm, bona fide offer, in any amount, was ever made. Although George, on at least two occasions, suggested getting together and going over the books so that a figure could be developed and agreed upon, they refused. Indeed there is nothing in the record which indicates an intention on the part of Stanley and Francis to do other than "stand pat" until George might be willing to accept whatever they might feel like paying.

The record does not reveal why counsel, after having made a formal demand on Stanley and Francis in late September 1962, waited until early March 1963 before filing suit. How-

ever, since counsel may well have been engaged in attempts to arrive at a satisfactory compromise, perhaps it would not be fair to charge this time against George. The pace accelerated somewhat after suit was filed and within four months Keppel had completed and filed his report. Stanley and Francis did nothing (nor did George) until September when the offer, hereinbefore mentioned, was made. We think George was justified in refusing to settle on the basis proposed.

In the absence of some evidence to the contrary we shall assume that 22 January 1964 was the earliest date which could have been arranged for the hearing before Judge Boylan. Furthermore neither George nor his attorney can be blamed for the delay brought about by Judge Boylan's illness and death. And we can understand that Judge Weant, because of Judge Boylan's unfinished work, may not have been able to take up the case until June 1965. His decision was certainly prompt but we cannot say that George was not justified in taking this appeal which, of course, resulted in further delay. So while it is true that the disposition of this case has been unduly protracted and that George is not altogether blameless in this regard, nevertheless it is undisputed that Stanley and Francis have been and now are in the possession and sole control of the assets of the partnership (including George's ⅓ interest) since April 1960 and are now operating and conducting the business. Nor is it disputed that they have tendered to George neither profits nor interest. George testified he was obliged to pay income taxes on his share of the profits for the year 1960 but that he received none of the income. What may have happened after 1960, in regard to taxes, is not in the record.

Since we have so recently considered the principles of law applicable to the case at bar an extended discussion at this time is unnecessary. As Judge Oppenheimer pointed out, for the Court, in *Gianakos, Ex'r v. Magiros,* 238 Md. 178, 184-85, 208 A. 2d 718 (1965) :

> "Absent any breach of fiduciary relationship, it is clear under the Act [The Uniform Partnership Act, Code, Art. 73 A] that Thomas, as surviving partner, had the right to continue the business without liquidation of the partnership affairs, under Section 41

(2) of the Act, with his own consent as representative of the deceased partner (George's estate of which Thomas was administrator) ; that such consent was given, although not in formal terms, by Thomas as administrator to Thomas as surviving partner; that by virtue thereof, under § 41 (3), Thomas, as surviving partner, had the same rights as if a formal assignment had been made; and that, there being no agreement to the contrary, under § 42 of the Act, Thomas' rights as George's administrator were to receive as an ordinary creditor the value of George's interest in the dissolved partnership, *with legal interest, or at Thomas' option, as George's representative, instead of interest on the claim, the profits attributable to the use of the right of George's estate in the property of the dissolved partnership.* Sykes, *Probate Law & Practice* (1956), § 553." (Emphasis supplied.) (The designated sections of the Act were set forth in the footnotes.)

In the case before us George did not give his consent "in formal terms." However, the partnership agreement indicates a clear intention that the remaining partners had the right, at their option, to continue the business, and, in our opinion, this amounts to implied consent. Moreover, George has never objected to their continuing to conduct the business. Since George demanded interest in his prayer for relief the question whether he should receive a share of the profits (if any) in lieu of interest, is not before us.

Something more than simple justice is involved in the allowance of interest. In *Hurst v. Hurst,* 401 Pac. 2d 232, 236 (Ariz. 1965), the court said: "The reason for allowance of interest or profits on his share to a retiring partner is to hasten the process of 'winding up'."

The Oregon court expressed the same thought in slightly different language:

"The option * * * to receive interest or profit on his share while awaiting receipt of this value upon the completion of the winding up of the partnership

business is in the nature of a species of compulsion as to those continuing the business in order to hasten its orderly winding up, thereby avoiding the burden to themselves of paying Wikstrom interest or profits for the use of his property." *Wikstrom v. Davis,* 211 Ore. 254, 315 P. 2d 597, 608 (1957).

The case will be remanded so that the order of 9 June 1965 can be modified to reflect (a) the addition to the judgment of one-third of whatever the interest on the savings account shall be determined to be up to 9 May 1960, (b) the allowance of interest from 9 May 1960, and (c) the fixing of the rate of interest at 5% which is the rate established by paragraph 12 of the partnership agreement.

*Remanded for modification in con-
formity with the views expressed
in this opinion and as modified,
affirmed. Costs to be paid by ap-
pellees.*