[No. 34409.   Department Two.   December 10, 1958.]

WILLIAM CROFTON *et al.*, *Respondents*, v. HOWARD S.
BARGREEN, *Appellant*.[1]

FOSTER, J., dissents.

*Parker Williams* and *Edward J. Novack*, for appellant.

*Welts & Welts* and *Clarence J. Coleman*, for respondents.

DONWORTH, J.—This action was brought by William Crofton and his son to recover the balance allegedly due under an option contained in a written partnership agreement

[1]Reported in 332 P. (2d) 1081.

which had been exercised by appellant. The trial court entered judgment for respondents in accordance with the prayer of the complaint, and appellant has appealed therefrom.

For convenience, William Crofton will be referred to as though he were the sole respondent, since his son, George, was a party plaintiff as the heir of his mother who had a community interest in the option at the time of her death. The son did not participate in any of the transactions involved in this suit.

In order to understand the legal problem involved, it is necessary to state the basic facts in some detail.

In 1917, respondent married the maternal aunt of appellant. For more than thirty-five years thereafter, the parties enjoyed a relationship characterized by respondent as "very good," and by appellant as "very close." This litigation appears to be the only substantial dispute which has affected that relationship.

From 1933 to December 31, 1944, appellant, as sole proprietor, operated a wholesale beer distributing business in Everett called Crown Distributing Company. The business was financially successful.

On January 1, 1945, the parties executed articles of copartnership which form the basis of the present controversy. The material portions thereof provided as follows:

"5. . . . [Appellant] is the present owner of the assets of said Crown Distributing Company and . . . [*respondent*] *desires to buy a 49% interest in said company* and further desires to operate said company together with . . . [appellant] as hereinafter provided, . . . [*appellant*] *to own 51% of the assets and* . . . [*respondent*] *to own 49% of the assets.*

"6. The *capital* of said co-partnership shall be contributed as follows: . . . [Appellant] will own 51% and . . . [respondent] will own 49% of the assets of said Crown Distributing Company at Everett, Washington. . . . [*Respondent*] *is buying said 49% interest therein under a note and chattel mortgage to carry interest at the rate of 6% per annum to be paid off as provided in said note and mortgage. The purchase price is to be based on the book*

*value, plus the book value figure for good will, the date of computation to be December 31, 1944.* . . .

"7. Each of the partners will draw $350.00 a month and all profits after the above drawing accounts are paid are to be divided 51% to . . . [appellant] and 49% to . . . [respondent]. The profits are to be figured at the end of each month, or such other periods as may be deemed proper by the partners. No profits shall be drawn unless it is agreed by both partners. Profits may be used to finance the business if deemed necessary. All operating and other expenses of the co-partnership shall be shared equally. . . .

"13. As an additional consideration for this agreement, . . . [respondent] grants . . . [appellant] the option, if . . . [appellant] desires to exercise it, to repur- chase the interest of the . . . [respondent] in the co- partnership for the amount that . . . [respondent] paid . . . [appellant] for his interest therein, said op- tion shall be exercised by giving thirty (30) days notice in writing to . . . [respondent] of . . . [appellant's] intention to exercise the option. The repurchase price shall be paid in cash and . . . [respondent] shall execute and deliver proper conveyances of all his interest therein upon the payment of the purchase price. In event of the death of . . . [appellant] this right shall pass to the estate of . . . [appellant] and may be exercised by the executor or administrator of . . . [appellant], which- ever shall be appointed.

"14. Each of the parties shall have their capital invest- ment as heretofore provided, subject to the limitation that . . . [respondent] is purchasing his interest in the busi- ness as heretofore described, and in event either party ad- vances or loans to the partnership any further or greater sums, such advances or loan shall be repaid such partner as soon as practical and convenient out of the profits, and upon any dissolution such advance or loan shall be first refunded before any division of capital assets takes place, that is to say, any advance or loan shall be repaid to the party on the same basis as any other creditor of the partnership shall be repaid."

The chattel mortgage mentioned in paragraph six of this agreement was executed by respondent and his wife in favor of appellant. It covered an undivided one-half interest in all of the assets of the partnership and was given as secu- rity for an interest-bearing note for $27,900.90, which repre-

sented forty-nine per cent of the book value of all assets of the business, including good will, computed as of December 31, 1944. This mortgage provided that all of respondent's forty-nine per cent of the profits in excess of respondent's salary, except those required in the business, should be applied to the payment of the mortgage debt until fully satisfied. Under this arrangement, it was possible for respondent and his then wife to acquire forty-nine per cent interest in a prosperous business without any cash contribution whatever from their own funds.

Shortly after entering into this agreement, respondent, who was about fifty-eight years of age at that time, commenced managing the partnership warehouse under the supervision of appellant, as provided in the articles of co-partnership.

The business thereafter continued to prosper to such an extent that at the end of two years respondent's forty-nine per cent share of the profits was sufficient to completely pay the note secured by his purchase-money mortgage, in addition to his income taxes. After 1946, although partnership profits declined somewhat, respondent's share averaged in excess of twenty-eight thousand dollars per year.

Respondent's wife (appellant's aunt) died January 1, 1949. During the latter part of March, 1953, respondent advised appellant of his intention to remarry. Appellant then told respondent that he wished to repurchase respondent's forty-nine per cent interest. Respondent made no objection to appellant's oral assertion of his right to purchase respondent's interest. Thereafter, the partnership was dissolved, effective April 30, 1953.

An instrument, entitled "Bill of Sale," dated April 27, 1953, purportedly subscribed and verified by respondent before a notary public (an official of the bank in which the partnership account was kept), was delivered to appellant for the purpose of conveying respondent's interest to him. Respondent denied the execution of this document. The trial court did not believe him. A second instrument, dated May 25, 1953, was executed by respondent George Crofton (who claims as an heir of his deceased mother) and appel-

lant, purporting to authorize respondent to sell George Crofton's inherited interest to appellant. A check for $9,141.84, dated May 25, 1953, was drawn on the partnership checking account in favor of respondent as payee. Although the signatures of both appellant and respondent had been required on partnership checks, only appellant signed for the Crown Distributing Company as maker. A signature purporting to be that of respondent appears as endorser on the instrument. Respondent denied ever endorsing or receiving this check. The trial court found, however, to the contrary.

Extracts from partnership books of account, which were admitted in evidence, show the apportionment of profits during the entire eight years and four months' existence of the partnership. The interest of each partner was set up therein as follows: At the time of the inception of the partnership, a capital account was set up for each of the partners. Respondent's initial capital account credit totaled $27,900.90, the amount which he had contracted to pay for his fortynine per cent interest in the business. Thereafter, as profits accrued and were apportioned, an appropriate credit entry was made to the capital account of each partner. From this total of capital contribution, plus profits, there was deducted from the account of each partner the amount of withdrawals for salary, income taxes, and accumulated profits.

Respondent's account revealed that from January 1, 1945, through April 30, 1953, his capital contribution ($27,900.90), plus his share of the profits ($259,885.33), totaled $287,786.23. But his withdrawals (including the sum of $27,900.90, together with interest thereon withdrawn and applied to the mortgage debt) during the same period totaled $280,718.17, thereby leaving a capital account credit of only $7,068.06 in his favor. In other words, at the time appellant elected to exercise his option to repurchase respondent's interest, the latter had overdrawn his capital account to the extent of $20,832.84. During this period, appellant's account balance grew (by reason of not withdrawing all of his fifty-one per cent of the profits) from his initial contribution of over twenty-nine thousand dollars to over fifty-four thousand dollars. The "book value" of the business increased

about four thousand dollars during the life of the partnership.

Respondent's share of partnership profits credited annually to his capital account, as reflected by partnership books, is supported substantially by the declarations of income made by respondent in his individual Federal income tax returns filed annually from 1945 through 1953. On the debit side of his capital account, withdrawals charged to respondent are supported by extracts from the partnership check register listing each check with its date, payee, check number, and amount. Many of these checks are in evidence. Some of these checks, drawn in favor of respondent as payee, respondent denied ever having endorsed or received. But he was unable to identify any particular check that he had not received. The trial court made no finding of fact on this point.

The bookkeeper was asked by appellant to compute from the books of account the amount which respondent was entitled to receive for his interest in the partnership. She reported that the figure should be $7,068.06. Appellant, mistakenly thinking that this amount did not include respondent's share of the "book value" for good will, caused this figure to be increased to $9,141.84. A check in this amount, payable to respondent, was signed by appellant and endorsed by respondent. Parenthetically, this resulted in an overpayment of approximately two thousand dollars, but that is immaterial since no issue regarding it has been raised.

Appellant testified that, after endorsing this check, respondent handed it to appellant with the suggestion that it be given to appellant's son, who was then operating an automobile sales agency. This disposition of the proceeds of the check was eventually made. Respondent denied endorsing the check or making this suggestion, but the trial court found that he had received $9,141.84 as part payment for his partnership interest.

After the dissolution of the partnership in April, 1953, respondent was retained as a salaried employee by appellant to perform the same duties as before. This employment

continued until the summer of 1954. Although the parties saw each other almost daily during this fourteen-month period, respondent never questioned or complained about the termination of their business partnership. About a year after he ceased to work for appellant, respondent met appellant by chance outside his warehouse and asked for the balance of the partnership settlement consummated two and one-half years before. Appellant advised him that he had been paid in full for his partnership interest. A later demand letter from respondent's attorney to appellant proved fruitless, and this action followed.

The original complaint of respondent's contained a prayer for dissolution of the partnership, an accounting, sale of partnership assets and division of the proceeds, and for the appointment of a receiver. Thereafter the complaint was amended, respondent alleging the dissolution of the partnership pursuant to the option contained in the partnership agreement (paragraph 13, above quoted); that, upon demand of appellant, respondent had turned over the partnership property to appellant, and that appellant failed to pay the sum of $27,900.90, which sum respondent had paid for his interest.

In his answer, appellant denied generally the allegations of the amended complaint, and affirmatively answered:

"That . . . [appellant] did pay unto the . . . [respondent] all of the purchase price of the interest of the said . . . [respondent] as provided in said partnership agreement, and pursuant to the oral agreement and understanding of the parties at the time, to-wit; on or about the 27th day of April, 1953, and that no further sums of any nature are due therefor, and that payment has been made in full, . . ."

Respondent replied, denying generally the affirmative allegations contained in appellant's answer.

Upon the issues thus joined, the cause proceeded to trial. At the conclusion of all the evidence, the trial court rendered an oral decision, which, after referring to paragraph thirteen of the partnership agreement, reads in part:

". . . Now, if this had read that he could repurchase the interest of the . . . [respondent] for the amount

of interest the . . . [respondent] had in the partnership, at the time of the repurchase, there would be no question that all he would have to pay is the amount that was remaining in the capital investment account. But under Paragraph 13, the fact that the capital investment account of . . . [respondent] was below the original 49% value, in my mind does not obviate the necessity of . . . [appellant] having to pay the $27,900.00.

"Taking up this matter, if his withdrawals were greater than his share of the profits, his investment was decreased, and therefore his interest is less at that time. Well, that may be true, that his present interest or the interest as of April 30, 1953, was decreased, but under the wording of this contract, I don't think that makes any difference. It is clear that he was to pay the amount that . . . [respondent] paid when he purchased his interest, to-wit: the sum of $27,900.90. That is the only interpretation I can give to this agreement.

"The fact that in Paragraph 14 it provides that the advances or loans to the partnership shall first be repaid to the one partner upon dissolution, does not, in my opinion, modify Paragraph 13 when . . . [appellant] was repurchasing the interest of . . . [respondent]. I think that language is definite and certain. It only applies to advances or loans, for one thing. This matter was a matter of excessive withdrawals, if anything, and does not constitute an advance or loan to the partnership, but, rather, was, if anything, an exccesive withdrawal on behalf of the one partner. And, further, I believe that Paragraph 14 only applies in case of dissolution, other than the purchase of one's interest. . . ."

The trial court found that appellant failed to prove a meeting of the minds of the partners on an oral settlement agreement, or any consideration sufficient to support such agreement; that respondent was "unaware of the effect of the provision in the contract as to how much money he was entitled to have and receive" upon the election of the appellant to exercise his option; that respondent had received and endorsed the check for $9,141.84 which constituted part payment upon the indebtedness of $27,900.90. The court further found that there was a balance due respondent of $18,759.06, together with interest thereon from April 30, 1953, and entered judgment accordingly.

■ The undisputed evidence preponderates against the trial court's finding (No. 5) that:

". . . William Crofton was unaware of the effect of the provision in the contract as to how much money he was entitled to have and receive upon the election of . . . [appellant] to exercise this option as set forth in paragraph 13 of the Partnership Agreement. . . ."

The record shows that respondent had access to the partnership books of account through the bookkeeper and also the accountant who audited the books. If respondent failed to avail himself of this means of ascertaining the facts as shown by the partnership books or failed to consult an attorney as to his rights under the articles of copartnership, the facts stated in finding No. 5 constitute no legal excuse for his failure to exercise reasonable diligence to inform himself. His lack of knowledge is immaterial. He had the same sources of knowledge as appellant and is chargeable with notice of all the facts which a reasonable investigation would have disclosed.

The only susbtantial issue presented is one of law, namely, the application of the partnership agreement to the facts stated, particularly the intention of the parties in including paragraph thirteen in the partnership agreement.

■ Three basic principles of contract construction recently reaffirmed by this court in *Hering v. St. Paul-Mercury Indemnity* Co., 50 Wn. (2d) 321, 311 P. (2d) 673 (1957), are: (1) The intention of the parties must control, (2) the intent must be ascertained from reading the contract as a whole, and (3) where the language used is unambiguous, an ambiguity will not be read into the contract.

Paragraph thirteen of this instrument is ambiguous. It grants appellant the option to "repurchase the *interest*" of respondent "for the amount that . . . [respondent] paid . . . [appellant] for his interest." The amount so paid was $27,900.90. But, did the parties intend that upon exercising this option appellant would be required to pay $27,900.90 in order to repurchase respondent's forty-nine per cent interest in all assets and profits and disregard an indebtedness to the partnership of $20,073.78, created by

respondent's overdrawing his capital account? Or, did they presuppose that respondent's capital account would not be diminished by his own overdrafts during the course of the partnership?

■ It is well established that:

" 'The court may always consider the surrounding circumstances leading up to the execution of an agreement, not to evidence an intent contrary to that expressed in the agreement, but to place the court in the same position as the parties. . . .' " *Kelly v. Valley Constr. Co.*, 43 Wn. (2d) 679, 688, 262 P. (2d) 970 (1953).

This is so because:

"The first and best resort in the construction of contracts is to put oneself in the place of the parties at the time the contract was executed—to look at it in prospect rather than in retrospect—for, when money disputes have arisen, the perspective is apt to be clouded by the unexpected chance of gain or self-interest." *Carnation Lbr. & Shingle Co. v. Tolt Land Co.*, 103 Wash. 633, 639, 175 Pac. 331 (1918).

See, also, *Boeing Airplane Co. v. Firemen's Fund Indemnity Co.*, 44 Wn. (2d) 488, 268 P. (2d) 654, 45 A. L. R. (2d) 984 (1954).

The position of the parties at the time of entering into their copartnership agreement may be summarized as follows:

Appellant wanted to assist his aunt financially. Her husband (respondent) was not then an owner in any business, but was an employee of the Everett Pacific Company. Appellant was operating several profitable enterprises which involved beer distributorship in this state. In the conduct of one of these businesses (the Crown Distributing Company, of which appellant was sole proprietor), he needed a warehouse manager. For these reasons, he offered respondent a forty-nine per cent interest in the business on a partnership basis without requiring him to make any initial capital investment in the enterprise. In lieu thereof, it was agreed that all of respondent's forty-nine per cent of the profits should be used to retire his promissory note for $27,-900.90 (secured by mortgage on his partnership interest)

until his capital contribution to the partnership evidenced by his note was paid in full. This capital contribution was based upon forty-nine per cent of the "book value" of all business assets. Respondent accepted appellant's proposal by signing the articles of copartnership and the partnership operated very successfully for more than eight years.

The articles of copartnership contained (among other provisions) the option set forth in paragraph thirteen, quoted above. Appellant reserved the right to acquire respondent's forty-nine per cent interest in the partnership property at any time for $27,900.90. This fixed price represented the amount which respondent was obligated to, and did, pay into the capital account from the first profits received by him after the partnership was created. The purpose of paragraph thirteen was to enable appellant to recapture his former position as sole proprietor of the business upon reimbursing respondent for his capital contribution, regardless of whether the actual value or "book value" of the capital assets had increased or diminished during the existence of the partnership because of normal business operations. In other words, appellant obligated himself to pay this fixed sum although through the exigencies of business the partnership capital might become depleted. But it does not follow that he was bound to pay this fixed price for capital assets which had been deliberately depleted by respondent's overdrafts.

To interpret paragraph thirteen as compelling appellant to disregard respondent's overdrafts and pay him the same sum to acquire respondent's interest as though he had maintained his capital account intact, is unreasonable, since it does violence to the intentions of the parties. It was entirely proper for appellant to deduct the amount of respondent's overdrafts ($20,073.78) from the upset price of $27,900.90, leaving a net balance of $7,068.06. Since respondent has received the sum of $9,141.84, he has been paid, and in fact overpaid, for his interest.

The facts of this case appear to be substantially similar to those before this court in *Ryan v. Ryan*, 48 Wn. (2d) 593, 295 P. (2d) 1111 (1956). We there held that a partner's ad-

vance withdrawal of twenty thousand dollars in partnership funds, before the time of dissolution set forth in a written agreement, was properly considered by the trial court to be part payment on the contract price. The same principle should be here applied.

The judgment is reversed with directions to dismiss respondent's action.

HILL, C. J., WEAVER, and ROSELLINI, JJ., concur.

FOSTER, J. (dissenting)—I dissent.

The court reverses the judgment and directs dismissal of the cause because the respondent had drawn on his capital account so that at the time of the dissolution it is claimed the value thereof was only $9,141.84. This overlooks appellant's admission of his indebtedness to the partnership at the time of the dissolution in the sum of $33,900. This, the trial court thought unimportant because of paragraph No. 13, which, so far as material, is:

". . . second party [Crofton] grants first party [Bargreen] the option, if first party desires to exercise it, to repurchase the interest of the second party in the co-partnership for the amount that second party paid first party for his interest therein, . . ."

It is admitted that the amount paid by the respondent was $27,900.90. The court found that the appellant elected to repurchase pursuant to the quoted provision of the articles, and gave appellant credit for the amount paid, $9,141.84, and entered judgment for the balance, $18,759.06. The appellant's admitted indebtedness of $33,900 to the partnership now becomes a matter of paramount importance because paragraph No. 14 provides for another method of dissolution which should be followed if paragraph No. 13 is not controlling. Paragraph No. 14 provides for capital investment accounts and the charging of advances and loans.

Both parties should be treated equally. If respondent's withdrawals are to be taken into account, so should the withdrawals of the appellant.

The argument of the appellant is that, at the time of dissolution, respondent's capital account was reduced to $9,141.84 by borrowing, and that a new oral agreement was made by which respondent agreed to accept the lesser sum instead of the amount fixed in the contract.

If respondent's interest had multiplied in value so that at the time of the exercise of the option it was worth many times the original cost, obviously, under the quoted terms, appellant could have purchased such interest for the amount respondent paid in the beginning; therefore, it is of no consequence that respondent's interest, at the time of the exercise of the option, was worth less than the amount originally paid. The controlling factor, in either event, is that the parties agreed appellant would pay, and respondent would accept, the original price. The judgment requires no more.

Appellant testified that prior to the payment to respondent in March, 1953, an oral agreement was made between the parties by the terms of which respondent agreed to accept a lesser sum for his partnership interest. Respondent testified unequivocally to the contrary. The court did not believe the appellant but did believe respondent and made a specific finding that no such agreement was ever made. We are not authorized, under such circumstances, to substitute our judgment for that of the trial court.

From 1893 to 1951, upon appeal to this court, factual disputes were retried, but this is no longer so. The territorial legislature enacted Laws of 1869, chapter 17, § 251, p. 60 (RCW 4.44.060), which has never been repealed, and is as follows:

"The order of proceedings on a trial by the court shall be the same as provided in trials by jury. *The finding of the court upon the facts shall be deemed a verdict*, and may be set aside in the same manner and for the same reason as far as applicable, and a new trial granted." (Italics mine.)

Under this statute, if the findings are supported by substantial evidence, this court is not authorized to substitute its judgment for that of the trial court. Findings of fact possess the same sanctity upon appeal as the verdict of a

jury. The test is: Does the evidence support the verdict? Only the respondent's evidence is considered, and that evidence is considered in the light most favorable to the respondents with all favorable inferences.

In construing this statute, the court said in *Reynolds v. Dexter Horton & Co.*, 2 Wash. 185, 26 Pac. 221:

". . . Unless the finding was so clearly unfounded as that it should have been set aside had it been made by a jury, we should not disturb it. It stands as a special verdict, and must be so treated. . . ."

In *Graves v. L. H. Griffith Realty &. Banking Co.*, 3 Wash. 742, 29 Pac. 344, the court explained the effect of the section in these words:

"The main contention here is, that the evidence does not support the findings. An appellate court in a law case will not usurp the functions of a jury, or of a judge acting in the capacity of a jury, and reverse the judgment because the weight of testimony seems to be on the other side, or because, in a case of conflict of testimony, the jury believed the testimony of witnesses that it does not believe. This doctrine is so elementary and so universally pronounced by the courts that it would be idle to enlarge on it or to discuss it further. It is sufficient to say that the jury is the judge of the facts. If the testimony on which the judgment is based is competent, and is legally introduced, and if conceded to be true would sustain the judgment, the appellate court will not inquire further as to its sufficiency. . . ."

But all of this was changed by the appeal act of 1893 (Laws of 1893, chapter 61, p. 119) which required a retrial of factual disputes in all nonjury cases if the evidence was brought up.

Section 21 of that act, so far as material, is:

". . . and in actions legal or equitable, tried by the court below without a jury, wherein a statement of facts or bill of exceptions shall have been certified, the evidence of facts shown by such bill of exceptions or statement of facts shall be examined by the supreme court *de novo*, so far as the findings of fact or a refusal to make findings based thereon shall have been excepted to, and the cause shall be determined by the record on appeal, including such exceptions or statement." Laws of 1893, chapter 61, § 21, p. 130.

In *Roberts v. Washington Nat. Bank*, 11 Wash. 550, 40 Pac. 225, that statute was construed and the court's conclusions announced in the following words:

"Under the act of 1893 (Laws, p. 130, § 21) findings of fact in an equity case and in one at law are placed upon substantially the same basis, but thereunder it is made the duty of the appellate court, when exceptions are properly taken to such findings, to examine the proofs contained in the record *de novo*. . . .

"In the case at bar all of the findings of fact were excepted to, and the record contains all of the proofs offered upon the trial in the court below. Hence, it becomes the duty of this court to find substantially as a new question the facts within the pleadings established by such proofs, and determine the rights of the parties upon the facts so found, even although the trial court upon such proofs had found them differently. In determining the facts established by the proofs the findings of the trial court should receive consideration, but cannot be allowed to control when in the opinion of this court they are contradicted by a clear preponderance of the evidence."

In explaining the quoted provisions of the appeal act of 1893, the court said in *Tilden v. Gordon & Co.*, 34 Wash. 92, 74 Pac. 1016:

". . . This means that this court shall try *de novo* all questions of fact, where the evidence has been preserved and the trial court's findings have been excepted to. . . ."

See, also, *Furth v. Baxter*, 24 Wash. 608, 64 Pac. 798.

But that statute no longer exists. It was first abrogated by the court itself under the rule-making power. *Fischler v. Nicklin*, 51 Wn. (2d) 518, 319 P. (2d) 1098. It was expressly repealed by the legislature. Laws of 1957, chapter 7, § 10 (27), p. 25, 26.

The controlling statutory rule respecting the court's jurisdiction to review factual disputes is RCW 4.44.060.

No longer may this court substitute its judgment for that of the trial court on factual disputes. This court's power is appellate only. It begins and ends with ascertaining whether the findings are supported by evidence or not. If the findings are supported by the evidence, the judgment

must be affirmed. In no event are we allowed to substitute our judgment for that of the trial court however much it may be believed that an erroneous conclusion was reached. We recently summarized the rule in *Croton Chemical Corp v. Birkenwald, Inc.,* 50 Wn. (2d) 684, 314 P. (2d) 622, as follows:

"The court had the right to believe either theory, since both are adequately supported by competent evidence. The court chose to believe the defendant's theory and entered judgment accordingly. The plaintiff appeals.

"RCW 4.44.060, Rem. Rev. Stat., § 368, provides, *inter alia:*

" ' . . . The finding of the court upon the facts shall be deemed a verdict, and may be set aside in the same manner and for the same reason as far as applicable, . . .'

"Since the court's findings and judgment are supported by the record, we will not overturn them."

And, more recently, in *Fischler v. Nicklin, supra,* we said:

"The court had the right to believe the testimony of either party but chose to believe the respondents' denial. Even if we were of the view that the appellants' version was the correct one, since the abrogation by rule of the trial *de novo* requirement of factual disputes on appeals in nonjury cases contained in the appeal act of 1893, Laws of 1893, chapter 61, § 21, p. 130 (Rem. Rev. Stat., § 1736), Rule on Appeal 65, 34A Wn. (2d) (Supp. No. 7) 27, as adopted effective January 3, 1956, we are not authorized to substitute our judgment for that of the trial court. *Bremerton School Dist. 100-C v. Hibbard, ante* p. 226, 317 P. (2d) 517; *Croton Chemical Corp. v. Birkenwald, Inc.,* 50 Wn. (2d) 684, 314 P. (2d) 622."

See, also, *Kuyath v. Anderson Constr. Co.,* 52 Wn. (2d) 174, 324 P. (2d) 264.

In *Wikstrom v. Davis,* 211 Ore. 254, 315 P. (2d) 597, the supreme court of Oregon dealt with a partnership dissolution in which the partnership articles were quite similar. The provision of that contract was:

" ' * * * The price to be paid by the said Alvin F. Wikstrom for the 49% interest in the stock, good will and fixtures shall be 49% of the value of the fixtures at the

figure above mentioned [$3820.50], plus 49% of the value of the stock which is to be determined by an inventory to be taken as of January 1, 1948, * * * .' "

Upon appeal, the supreme court of Oregon held:

"This language of the agreement is plain and unambiguous. It contains no provision for deducting the amount of such accounts payable as the Davises may have had on January 1, 1948. We find no evidence warranting a conclusion that a figure for accounts payable was an element to be considered in calculating the purchase price chargeable to Wikstrom. . . ."

In settling the partnership accounts, the trial court deducted the amounts which the appellant (seller) owed at the time of the admission of respondent to the partnership. This was reversed because the contract contained no such provision. The court said:

"To accomplish this result was, in effect, making a new contract between the parties as to the manner for determining Mr. Wikstrom's obligation to the Davises."

Here paragraph No. 13 provides that appellant shall pay respondent for his interest the same amount which he paid. The contract does not contain any provision which authorizes the court to deduct from that amount any sums which respondent may have withdrawn from the partnership. The court is not authorized to make a new contract. *Clements v. Olsen*, 46 Wn. (2d) 445, 282 P. (2d) 266; *Finch v. King Solomon Lodge No. 60*, 40 Wn. (2d) 440, 243 P. (2d) 645.

The payment of a smaller sum, which appellant was already bound to pay, is no consideration for the alleged promise of the respondent to forego the residue.

Such has been the law for over three hundred fifty years.[2]

It is stated in 1 Restatement, Contracts, 83, § 76:

"Any consideration that is not a promise is sufficient . . . except the following:

---

[2]In 1602, all of the common-law judges agreed in *Pinnel's* case, 77 Eng. Rep., K. B. 237, 5 Coke 117a, that the payment of a smaller sum will not discharge the whole debt then due even if the creditor agreed.

The same view was reiterated in 1884 by the highest court in the British Empire in *Foakes v. Beer*, 9 App. Cac. 605.

"(a) An act or forbearance required by a legal duty that is neither doubtful nor the subject of honest and reasonable dispute if the duty is owed either to the promisor or to the public, or, if imposed by the law of torts or crimes, is owed to any person;"

The headnote to Contracts, 17 C. J. S. 469, § 114, is:

"Ordinarily the payment of a smaller sum in satisfaction of a larger is not a good discharge of the debt, but this rule is not applicable where there is a new circumstance raising a new consideration."

1 Williston, Contracts, 415, 416, § 120, states:

". . . Accordingly, the agreement of the creditor to discharge the whole debt then and there due in consideration of the payment of part is unsupported by sufficient consideration. . . ."

Our own cases are in accord. *Sanford v. Royal Ins. Co.*, 11 Wash. 653, 40 Pac. 609; *Anderson v. Sanitary Dairy*, 160 Wash. 647, 295 Pac. 925.

Had appellant proved an oral modification of the partnership articles—that the respondent would sell his interest for the amount which he paid therefor less the amount borrowed from the partnership—still the appellant should not prevail, because there was no new consideration for such change. It is not claimed that there was any new consideration. The court specifically found there was none. The findings recite: "The Court further finds that there was no new consideration flowing between the parties, . . ."

This is fatal to appellant's claim. At the time appellant exercised his option to buy respondent's interest in the firm, the partnership contract was executed. It was no longer executory. We recently held in *Snyder v. Roberts*, 45 Wn. (2d) 865, 278 P. (2d) 348, 52 A. L. R. (2d) 631:

". . . The rule is well settled that, when a contract has been executed by one of the parties thereto, it cannot be modified except by agreement supported by a new consideration. *Tacoma & Eastern Lbr. Co. v. Field & Co.*, 100 Wash. 79, 170 Pac. 360 (1918); *Stauffer v. Northwestern Mut. Life Ins. Co.*, 184 Wash. 431, 51 P. (2d) 390 (1935); *Hopkins v. Barlin*, 31 Wn. (2d) 260, 270, 196 P. (2d) 347 (1948)."

See, also, 17 C. J. S. 861, § 376 (a).

The quoted provision of paragraph No. 13 is free from doubt. Indeed, it is difficult to conceive of plainer language. The rules of construction are resorted to only if the matter is doubtful. *Schwieger v. Harry W. Robbins & Co.*, 48 Wn. (2d) 22, 290 P. (2d) 984; *Silen v. Silen*, 44 Wn. (2d) 884, 271 P. (2d) 674; *Jackson v. Domschot*, 40 Wn. (2d) 30, 239 P. (2d) 1058; *Tube-Art Display v. Berg*, 37 Wn. (2d) 1, 221 P. (2d) 510; *Bellingham Securities Syndicate v. Bellingham Coal Mines*, 13 Wn. (2d) 370, 125 P. (2d) 668; *Brooks v. Brumfield*, 129 Wash. 361, 225 Pac. 232; *Puget Sound International R. Co. v. Everett*, 103 Wash. 495, 175 Pac. 40; *Armstrong v. Wheeler*, 86 Wash. 251, 150 Pac. 5.

It is familiar law[3] that, if the meaning of a contract is doubtful or ambiguous, or susceptible of two interpretations, it will be construed against the party drawing it, or the construction adopted which favors the opponent. The partnership agreement was drafted by appellant's attorney. *State Bank of Wilbur v. Phillips*, 11 Wn. (2d) 483, 119 P. (2d) 664; *Zinn v. Equitable Life Ins. Co. of Iowa*, 6 Wn. (2d) 379, 107 P. (2d) 921; *Wenatchee Production Credit Ass'n v. Pacific Fruit & Produce Co.*, 199 Wash. 651, 92 P. (2d) 883; *Foss v. Golden Rule Bakery*, 184 Wash. 265, 51 P. (2d) 405; *Fitzpatrick v. Bradshaw*, 171 Wash. 335, 17 P. (2d) 894; *Clise Inv. Co. v. Stone*, 168 Wash. 617, 13 P. (2d) 9; *Chermak v. P. J. Taggares, Inc.*, 166 Wash. 67, 6 P. (2d) 380; *Camp v. Carey*, 152 Wash. 480, 278 Pac. 183; *Mikusch v. Beeman*, 110 Wash. 658, 188 Pac. 780; *Puget Sound International R. Co. v. Everett, supra; In re Eighth Avenue in City of Seattle*, 82 Wash. 398, 144 Pac. 533.

The parties agreed in writing that the appellant could repurchase the interest of respondent in the partnership for the same amount which respondent paid therefor. Such, likewise, is the judgment, which I would affirm.

---

[3] 17 C. J. S. 751, § 324; 12 Am. Jur. 795, § 252.

---

March 11, 1959. Petition for rehearing denied.