## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

OM ENTERPRISES V LLC; )
AMARNATH DEVA, Manager of OM ) No. 70118-5-I
Enterprises V LLC, )
)
Appellant, ) DIVISION ONE
)
)
v. )
)
KAMAL TANDON and ANITA TANDON,)
husband and wife and the marital )
community composed thereof; )
SUNIL DHAR and RENUKA DHAR, ) UNPUBLISHED OPINION
husband and wife, and the marital )
community composed thereof; SUNIL ) FILED: May 27, 2014
DHAR, TRUSTEE OF SUNIL AND )
RENUKA DHAR TRUST; AJAY )
KOTTAPALLI and MAHIJA )
KOTTAPALLI, husband and wife and )
the marital community composed )
thereof; CHANDRA BHASKARA and )
LAKSHMI RAMASUBRAMANIAN, )
husband and wife and the marital )
community composed thereof; DINESH )
NAKKA and SREEDEVI NAKKA, )
husband and wife and the marital )
community composed thereof; JAMES )
POOLEY and JANE DOE POOLEY, )
husband and wife and the marital )
community composed thereof; JAMES )
POOLEY, TRUSTEE OF ANDERSON )
POOLEY FAMILY TRUST; )
KAMLAWANTI GOUNDER, a single )
person; SHYAMAL GOUNDER, a )
single person and in his capacity as )
legal guardian of KAMLAWANTI )
GOUNDER; BALRAJ BAKSHI and )
JANE DOE BAKSHI, husband and wife )
and the marital community composed )

thereof; SUDERSHAN BAKSHI and )
JOHN DOE BAKSHI, wife and husband )
and the marital community composed )
thereof; KERRY NEWMAN and JANE )
DOE NEWMAN, husband and wife and )
the marital community composed )
thereof; MICHAEL BREWSTER and )
JANE DOE BREWSTER, husband and )
wife and the marital community )
composed thereof; BIDAN BREWSTER )
and JANE DOE BREWSTER, husband )
and wife and the marital community )
composed thereof; TAD BREWSTER )
and JANE DOE BREWSTER, husband )
and wife and the marital community )
composed thereof; MUBARAK GROUP )
INC., a Washington corporation; P )
THREE COMPANIES LLC, a Virginia )
limited liability company; )
VARAPRASAD BONAGIRI and )
SUSHANI PALADI, husband and wife )
and the marital community composed )
thereof; RAMPAUL GUPTA and )
SAROJ GUPTA, husband and wife and )
the marital community composed )
thereof; RAMPAUL GUPTA, TRUSTEE )
OF SAROJ AND PAUL GUPTA TRUST;)
PRASAD ILLAPANI and JANE DOE )
ILLAPANI, husband and wife and the )
marital community composed thereof; )
PRITHIPAL SINGH and RAJINDER )
SINGH, husband and wife and the )
marital community composed thereof; )
PRITHIPAL SINGH, TRUSTEE OF )
PRITHIPAL SINGH and RAJINDER K. )
SINGH TRUST; RAJNEEL NAICKER )
and JANE DOE NAICKER, husband )
and wife and the marital community )
composed thereof; KUVERAN )
NAICKER and GYAN DEVI NAICKER, )
husband and wife and the marital )
community composed thereof; RAM )
KUMAR and GEETA SWAMY, husband )
and wife and the marital community )
composed thereof; RAM PRASAD )
and JANE DOE PRASAD, husband and )

2

wife and the marital community )
composed thereof; RAMESH BACHALA )
and SARALA BACHALA, husband and )
wife and the marital community )
composed thereof; RAVI MUMMULLA )
and SATYA MUDILI, husband and wife )
and the marital community composed )
thereof; ROHAN SAMUEL LAM and )
JANE DOE LAM, husband and wife and )
the marital community composed )
thereof; SAMANTHAPUDI RAJU and )
MADHAVI RAJU, husband and wife and )
the marital community composed )
thereof; SREENATH GAJULAPALLI and )
ARUNA GAJULAPALLI, husband and )
wife and the marital community )
composed thereof; SRIKANTH KASAM )
and JANE DOE KASAM, husband and )
wife and the marital community )
composed thereof; SURENDER ZUTSHI )
and RUCHI ZUTSHI, husband and wife )
and the marital community composed )
thereof; SURENDER ZUTSHI, )
TRUSTEE of ZUTSHI FAMILY R. )
TRUST; MADHUSUDHAN REDDY and )
VINAYA REDDY, husband and wife and )
the marital community composed )
thereof; VIPAN GUPTA and SUNITA )
GUPTA, husband and wife and the )
marital community composed thereof; )
ZAFAR RIZVI and YOSHIKO RIZVI, )
husband and wife and the marital )
community composed thereof; )
HARNINDER SANGHA and JANE DOE )
SANGHA, husband and wife and the )
marital community composed thereof; )
KIRAN ELLANTI and JANE DOE )
ELLANTI, husband and wife and the )
marital community composed thereof; )
MAHIDHAR REDDY and JANE DOE )
REDDY, husband and wife and the )
marital community composed )
thereof; SOVITA RIMAL and RAJ )
SHARMA, wife and husband and the )
marital community composed thereof; )
AMARNATH DEVA and JAYA DEVA, )

3

husband and wife and the marital )
community composed thereof; VENU )
GOPAUL and JANE DOE GOPAUL, )
husband and wife and the marital )
community composed thereof; FLOYD )
MCEWEN, individually; GILBERT )
MCEWEN, individually; ARDELLA )
HARN, individually; VIRGINIA )
BRAESCH, individually; and LONDA )
BLAKE, individually, )
  )
                Defendants, )
  )
SHIVANCHAL ENTERPRISES LLC, a )
Washington limited liability company; )
RAVI MITTAL and RIPU MITTAL, )
husband and wife and the marital )
community composed thereof; )
  )
                Respondents. )
_____)

BECKER, J. — In an accounting incident to the winding up of a limited liability company, each member's capital account is valued. The valuation of a capital account is distinct from the litigation of any claim the company may have against the member. The company has a right to reduce the member's capital account to zero because his withdrawals exceeded contributions. Instead of recognizing this right, the trial court ruled on summary judgment that the company was obliged to act as though the member's share consisted of his contributions without any offset for his improper withdrawals. We reverse. Even if it was too late for the company to bring a legal claim against the member to recover the improper withdrawals, the company was entitled to take the withdrawals into consideration in computing the value of the member's capital account.

4

This case arises out of the dissolution of OM Enterprises V LLC, a Washington limited liability company—hereafter "OM." The appellants are OM and Amaranth Deva, the current member manager of the company. The respondents are Ravi and Ripu Mittal and their solely owned limited liability company. The Mittals are the successors to the OM account of Kamal Tandon, the company's founding member manager and initial president. The decision under review is the order granting the Mittals' motion for summary judgment dismissal of OM's dissolution plan.

We review de novo a trial court's decision on summary judgment, performing the same inquiry as the trial court. Roger Crane & Assocs., Inc. v. Felice, 74 Wn. App. 769, 773, 875 P.2d 705 (1994). We consider the evidence in the light most favorable to OM, the nonmoving party. CR 56. Any findings of fact or conclusions of law entered by the trial court are superfluous and do not affect the inquiry on appeal. Skimming v. Boxer, 119 Wn. App. 748, 755, 82 P.3d 707, review denied, 152 Wn.2d 1016 (2004). Unless otherwise indicated, our discussion of the facts is taken from Deva's declaration.

On September 5, 2005, OM was formed. OM negotiated an agreement with Papa John's International to operate its franchises in India. OM owned one subsidiary—OM India. OM's primary function was to raise money to fund the operations of OM India.

Tandon was the member manager of OM from formation to March 9, 2007. Deva was the acting vice president. Deva worked in India, overseeing day-to-day operations of the restaurants. When Tandon resigned, Deva took

over company operations. Deva discovered that Tandon had failed to keep accurate records of the members' capital accounts and had made several hundred thousand dollars in unauthorized payments from company funds.

OM India fell behind on the development schedule required by the franchise agreement. Papa John's threatened to revoke its agreement with OM. To avoid revocation or cancellation of the agreement, OM agreed to sell its shares in OM India and its rights under the franchise agreement to another company. On May 24, 2007, the members of OM approved the sale. On September 10, 2007, Deva completed the sale.

According to the declaration of Ravi Mittal, in July 2006, the Mittals and their company sued Tandon, his wife, and several commonly held entities including OM. The Mittals asserted dishonor of checks, securities act violations, and breach of contract. On December 10, 2007, they received a judgment against Tandon personally for $116,795.81. On July 9, 2008, the Mittals got a charging order, charging the Tandons' interest in OM with payment of the unsatisfied amount of judgment.

In 2011, OM received the funds from India and commenced the process of winding up. The OM LLC agreement provides that company assets are distributed to members according to each member's capital account balance:

> 17.3 **Winding Up, Liquidation and Distribution of Assets**. Upon dissolution, the Board of Managers shall immediately proceed to wind up the affairs of the Company, unless the business of the Company is continued as provided in Section 17.1.3. The Board of Managers shall sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Board of Managers may determine to distribute any assets to the Unit Holders in kind) and shall apply the proceeds of

6

such sale and the remaining Company assets in the following order of priority:

> 17.3.1 Payment of creditors, including Members and Managers who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, other than liabilities for distributions to Members;
>
> 17.3.2 To establish any reserves that the Board of Managers deems reasonably necessary for contingent or unforeseen obligations of the Company and, at the expiration of such period as the Board of Managers shall deem advisable, the balance then remaining in the manner provided below;
>
> 17.3.3 *To the Unit Holders in proportion to the positive balances of their respective capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year during which the liquidation occurs;*
>
> 17.3.4 Any remaining assets shall be distributed to the Unit Holders in proportion to their Percentage Interests.

(Emphasis added.) Capital accounts are valued by adding all contributions made by the member and subtracting any payments made to or on behalf of any member:

> **10.2.1 Capital Accounts**. A capital account ("Capital Account") shall be maintained for each Unit Holder. *The Capital Account maintained for such Unit Holder shall be increased by* (a) the amount of cash and the Fair Market Value of property (net of related liabilities) originally contributed to the Company by such Unit Holder as a capital contribution, (b) the amount of additional cash or the Fair Market Value of additional property (net of related liabilities) contributed to the Company by the Unit Holder, and (c) such Unit Holder's share of Net Profits and Gain on Sale of the Company; *and shall be decreased by* (x) all distributions to such Unit Holder from the Company other than repayment of loans or interest thereon, (y) such Unit Holder's share of the Net Losses and Loss on Sale of the Company and (z) *all other payments allocated to such Unit Holder.* The foregoing provisions defining a Unit Holder's Capital Account are

> intended to comply with capital account maintenance provisions of Treasury Regulation 1.704-1(b) and shall be interpreted and applied consistent with such Regulation. In the event that the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulation, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Unit Holder or on the obligations of any Unit Holder to restore a deficit balance in its Capital Account.

(Emphasis added.)

Tandon did not keep accurate records. The best evidence of members' capital account balances was an email sent by Tandon dated January 3, 2007, purporting to list the capital account balances of all members. Deva used the balances listed in that email as a baseline. He asked each member to provide affirmative proof of their claimed contributions. This proof included cancelled checks, transfer slips, deposit slips, wire transfer information, bank records, and receipts issued by OM itself. Each member was credited with only the contributions they could prove.

The January 2007 email listed the value of the Tandon capital account at $513,400. But Tandon did not provide affirmative proof of his contributions. Deva reviewed the company's bank records to determine whether deposits were made on or about the dates and in the amounts identified and attributed to Tandon in his email. Deva identified $440,800 of deposits that approximately corresponded with amounts and dates of contributions claimed by Tandon in the email and were not returned for insufficient funds. Two other members provided proof that $25,000 of the contributions claimed by Tandon were actually made by

8

them for their own benefit. Deva thus determined that the sum of contributions possibly made by Tandon was $415,800.

Deva also found a number of unauthorized payments made by Tandon. The bank accounts for OM were properly used for two things: (1) to make payments to OM's two domestic vendors—Papa John's and United Source One—and (2) to transfer funds into OM India's bank accounts in India. Deva identified 62 payments or withdrawals made by Tandon between March 25, 2005, and June 2, 2006, totaling $490,401.95, that were unrelated to either of these purposes. Included were payments to Tandon's personal creditors and to companies owned by Tandon in which OM was not involved.

Deva calculated the value of the Tandon capital account by subtracting the unauthorized payments from the contributions. He relied in part on section 10.2.1(z) of the LLC agreement which provides that capital accounts are decreased by "all other payments allocated to such Unit Holder." This resulted in a balance of -$74,601.95. Deva chose to value the account at zero. If Deva's valuation is approved, the Mittals—as the holders of a charging order against Tandon's interest in the company—will receive nothing from proceeds of the sale of OM when the company's assets are distributed upon dissolution.

On January 26, 2012, OM filed an action for dissolution. OM and Deva were the plaintiffs. The defendants were all possible members of the LLC. The Mittals were among the named defendants. The complaint asked for an order authorizing dissolution of the company:

> 1.1 Plaintiff brings this action for dissolution under Section 25.15.275 of the Revised Code of Washington (RCW) which

9

authorizes this Court to decree dissolution of a limited liability company when it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement or other circumstances render dissolution equitable.

The complaint also requested a declaratory judgment that Deva's system for calculating capital account values was permissible:

> 1.2 Plaintiff brings this action for declaratory judgment under RCW Chapter 7.24 declaring the validity of the distribution of remaining assets, following the winding up of OM's affairs, to OM's members in accordance with their pro rata share of capital contributions as shown in **Exhibit A** attached hereto.

On November 6, 2012, the Mittals filed a motion for summary judgment, asking the court to find that OM had no authority to offset Tandon's capital account contributions by the unauthorized payments.

On January 23, 2013, the motion was granted. The court ordered the company to "make returns of capital or distributions, as appropriate, to the Mittals based on the entire capital account associated with the Tandon share that is subject to the King County Charging Order." The court denied Deva's request for approval of his proposed disbursements. The court also denied Deva's motion for reconsideration. This appeal followed.

Deva argues that the trial court erred when it found that the company lacked authority to adjust Tandon's capital account to reflect his unauthorized withdrawals. The Mittals' arguments in response depend on their assumption that calculating Tandon's share by subtracting withdrawals from contributions was an attempt to recover against Tandon on a legal claim for mismanagement. Deva's position is that the valuation of Tandon's share was a necessary incident to winding up. Because we agree with Deva that the action is in the nature of an

10

accounting rather than a legal claim against Tandon, the arguments made by the Mittals in support of summary judgment miss the mark.

The company filed for dissolution. Under the terms of the operating agreement, the company has to calculate the value of each member's capital account to distribute the proceeds of the sale. Even the Mittals acknowledge that the action is one for winding up. Because the action is for dissolution of the company, not for a judgment against Tandon, it is appropriate to consider Deva's calculation of Tandon's share as an accounting, not as a legal action.

## EFFECT OF THE MITTALS' CHARGING ORDER

The Mittals hold a charging order against Tandon's interest in OM. The Mittals argue that, as holders of that charging order, they have the right to receive distributions to the extent necessary to satisfy their judgment plus interest. The Mittals insist that Deva is attempting to offset Tandon's interest by unadjudicated claims and that such an offset is tantamount to holding them liable for debts associated with membership in contravention of RCW 25.15.250(4).[1]

The Mittals are not being held liable for debts associated with membership. As holders of a charging order, the Mittals are assignees of

---

[1] "Unless otherwise provided in a limited liability company agreement and except to the extent assumed by agreement, until an assignee of a limited liability company interest becomes a member, the assignee shall have no liability as a member solely as a result of the assignment." RCW 25.15.250(4).

Tandon's interest. RCW 25.15.255.[2] As assignees, the Mittals are entitled to Tandon's interest and cannot recover more than Tandon could have. See Havsy v. Flynn, 88 Wn. App. 514, 519, 945 P.2d 221 (1997).

In an accounting to wind up the LLC, Tandon's interest is equal to his capital contributions minus the unauthorized payments. The Mittals' charging order does not affect the value of Tandon's interest in the LLC. They take from the company what Tandon has—which is nothing—unless they can show Deva's computation of Tandon's contributions and withdrawals is inaccurate. As yet, they have not shown that.

EFFECT OF STATUTES OF LIMITATIONS

The Mittals have argued that the company's action is barred by a three-year statute of limitation because it is an action to recover on unadjudicated claims against Tandon. Because this is not a claim against Tandon, but rather an accounting to wind up business, the statutes of limitation cited by Mittals are inapplicable.

EFFECT OF TANDON'S BANKRUPTCY

The Mittals argued below that Tandon's liability for negligence or mismanagement was discharged in bankruptcy by order dated April 5, 2012, and as a result the company was enjoined from attempting to collect a discharged debt. Again, the company was winding up its business, not suing Tandon for

[2] **"Rights of judgment creditor.** On application to a court of competent jurisdiction by any judgment creditor of a member, the court may charge the limited liability company interest of the member with payment of the unsatisfied amount of the judgment with interest. To the extent so charged, the judgment creditor has only the rights of an assignee of the limited liability company interest. This chapter does not deprive any member of the benefit of any exemption laws applicable to the member's limited liability company interest." RCW 25.15.255.

12

negligence or mismanagement. To wind up its business, the company calculated Tandon's capital account as the sum of his contributions minus unauthorized payments, as called for by the operating agreement. Tandon's unauthorized payments were made between March 25, 2005, and June 2, 2006. They exceeded the amount of previous contributions. Thus, the value of Tandon's interest was negative as of June 2, 2006, almost six years before entry of the bankruptcy order. The bankruptcy has no effect on the valuation of Tandon's capital account.

## AUTHORITY TO OFFSET

The Mittals argue there is no authority permitting the company an offset for unadjudicated claims against Tandon. It is unnecessary to consider that argument because the action is for winding up the LLC, not for collecting on the company's unadjudicated claims against Tandon. In winding up, a company's distribution of cash or assets is controlled by the terms of the LLC agreement. RCW 25.15.205. Here, the agreement provided for company assets to be distributed to members according to each member's capital account balance. After payments to creditors and reserve accounts, proceeds from the sale or liquidation of the company's assets go to "the Unit Holders in proportion to the positive balances of their respective capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year during which the liquidation occurs." Capital accounts are calculated as Deva proposed, by adding all contributions made by the member and subtracting any payments made to or on behalf of that member. The unauthorized payments made by

13

Tandon while he was manager were appropriately treated as payments allocated to him under section 10.2.1(z).

The Mittals argue that deducting the unauthorized payments from Tandon's capital account is contrary to section 17.3.3 of the agreement which states that the balance of a capital account is to be determined "after taking into account all Capital Account adjustments for the taxable year during which the liquidation occurs." They also refer to section 10.2.1, which limits the extent of modifications OM's management can make to the manner in which a member's capital account is computed. The Mittals misapprehend the meaning of the language cited. As Deva explains, the language in section 17 means that adjustments made in the year of liquidation must be made before the positive balance (if any) used in the final distribution is determined. The language in section 12 is inapplicable because OM's management has not modified the contractual formula for valuing the capital accounts.

EFFECT OF RCW 25.15.235(3)

Upon OM's motion for reconsideration, the trial court ruled that the adjustment Deva proposed to make to Tandon's capital account was time barred under RCW 25.15.235(3). RCW 25.15.235 sets out circumstances in which a member is liable to the company for distributions received when the company has insufficient funds to pay creditors:

> (1) A limited liability company shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution (a) the limited liability company would not be able to pay its debts as they became due in the usual course of business, or (b) all liabilities of the limited liability company, other than liabilities to members on account of their

14

limited liability company interests and liabilities for which the recourse of creditors is limited to specified property of the limited liability company, exceed the fair value of the assets of the limited liability company, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited liability company only to the extent that the fair value of that property exceeds that liability.

(2) A member who receives a distribution in violation of subsection (1) of this section, and who knew at the time of the distribution that the distribution violated subsection (1) of this section, shall be liable to a limited liability company for the amount of the distribution. A member who receives a distribution in violation of subsection (1) of this section, and who did not know at the time of the distribution that the distribution violated subsection (1) of this section, shall not be liable for the amount of the distribution. Subject to subsection (3) of this section, this subsection (2) shall not affect any obligation or liability of a member under a limited liability company agreement or other applicable law for the amount of a distribution.

(3) Unless otherwise agreed, *a member who receives a distribution from a limited liability company shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of three years from the date of the distribution unless an action to recover the distribution from such member is commenced prior to the expiration of the said three-year period and an adjudication of liability against such member is made in the said action.*

RCW 25.15.235 (emphasis added).

The Mittals argue that Tandon's account cannot be reduced by his withdrawals because the company did not bring an action against him to recover the withdrawn funds within the three-year period specified in subsection (3) of the statute. The statute does not apply. The company is not bringing an action to recover distributions from Tandon and is not obligated to. What the company is doing is giving effect to the provisions of the LLC agreement for winding up. This requires the calculation of the value of each member's interest and involves decreasing that value by "payments allocated to" the member. It does not

15

require an action to establish the member's liability to the company under RCW 25.15.235(3).

Even if the statute could be interpreted to require a recovery action within three years against a member like Tandon who made withdrawals for his own benefit, the subsection begins with the phrase, "Unless otherwise agreed." The LLC agreement expressly directs the company to reduce a member's capital account balances by subtracting payments allocated to the member from that member's contributions.

Our conclusion that summary judgment was improperly granted is supported by partnership case law. The role of members in a member-managed LLC is analogous to that of partners in a general partnership, and partners are held accountable to each other and the partnership as fiduciaries. Maple Court Seattle Condominium Ass'n v. Roosevelt, LLC, 139 Wn. App. 257, 262, 160 P.3d 1068 (2007). Washington courts use case law interpreting partnership agreements and partnership statutes to decide limited liability company issues. Koh v. Inno-Pac. Holdings, Ltd., 114 Wn. App. 268, 271, 54 P.3d 1270 (2002).

Our Supreme Court confronted a similar situation in Crofton v. Bargreen, 53 Wn.2d 243, 332 P.2d 1081 (1958). In that case, Crofton and Bargreen formed a partnership engaged in a wholesale beer distribution business. Crofton made an initial capital contribution of $27,900.09. As part of the partnership agreement, Crofton granted Bargreen the option to repurchase his interest in the partnership at any time. The terms of repurchase required that Bargreen pay Crofton his initial capital contribution ($27,900.09) plus interest. Eight years later,

Bargreen exercised his right to repurchase Crofton's interest, triggering dissolution of the partnership. At the time of dissolution, Crofton's account revealed that, since formation, Crofton's withdrawals totaled $280,718.17 while his capital account totaled $287,786.23, leaving $7,786.23 in his capital account. Bargreen filed suit for dissolution and paid Crofton $9,141.84 (the balance of his capital account plus interest). Crofton demanded he be paid his entire capital contribution of $27,900.09, plus interest. Bargreen argued that, since Crofton had overdrawn his share of the profits, he should be required to pay only the $7,786.23 remaining in Crofton's capital account. The Court of Appeals found for Crofton. The Supreme Court reversed, finding that it would do violence to the intent of the parties to compel Bargreen to disregard Crofton's overdrafts and pay him the same amount as if he had maintained his capital account intact. Crofton, 53 Wn.2d at 253.

To find for the Mittals in this case would do more violence to the intent of the LLC agreement than finding for Crofton in Crofton. Crofton had the authority to draw funds out of the partnership. Tandon did not have authority to withdraw funds from OM for his personal use. Unless section 10.2.1(z) is interpreted to permit subtracting the withdrawn funds from Tandon's original investment when calculating the value of his capital account, Tandon, through his successors, the Mittals, will receive a windfall.

We conclude that OM had authority to decrease the value of Tandon's share in the company by the amount of his unauthorized withdrawals.

The order granting summary judgment is reversed.

WE CONCUR:

Becker, J.

Cox, J.